[No. C045684. Third Dist. Sept. 1, 2004.]

In re JACKIE DON WHITE on Habeas Corpus.

[No. C046271. Third Dist. Sept. 1, 2004.]

In re MELVIN RICHARD PENA on Habeas Corpus.

[No. C046677. Third Dist. Sept. 1, 2004.]

In re RENEE HARRIS-ANDERSON on Habeas Corpus.

**COUNSEL**

Richard H. Dangler for Petitioners Jackie Don White, Melvin Richard Pena and Renee Harris-Anderson.

No appearance for Respondent, the People.

Anthony L. Dicce for Richard H. Dangler, Jr., on contempt and sanctions.

## Opinion

**THE COURT.**[*]—In these proceedings, we must decide what an appellate court can and should do when confronted by a petition for writ of habeas corpus that is frivolous because "it indisputably has no merit," i.e., "when any reasonable attorney would agree that the [petition] is totally and completely without merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179].)

The numerous petitions for writs of habeas corpus filed by inmates incarcerated for criminal convictions are a staple of the workload of an appellate court. Each petition receives careful review by this court regardless of whether the petition is prepared and filed by the inmate, as in most cases, or by an attorney representing the inmate. Established rules of law favor the finality of judgments. Thus, it is not easy to show that an inmate is entitled to a writ of habeas corpus, and most petitions must be denied for the failure to state a prima facie case for relief. Yet, history demonstrates that the petition for writ of habeas corpus, often referred to as the Great Writ, has resulted in monumental rulings in favor of incarcerated inmates—rulings that have improved our legal system. (See, e.g., *Gideon v. Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792].)

Due to the importance of the Great Writ in our system of justice, it is critical not to impede such access to the courts or to deter, for fear of personal liability, the vigorous assertion of an inmate's rights. (*In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 647.) At the same time, Congress and the courts have recognized that inmates must not be allowed to abuse the habeas corpus process to unjustifiably delay the finality of judgments and thereby undermine public confidence in our legal system. (See *McCleskey v. Zant* (1991) 499 U.S. 467 [113 L.Ed.2d 517, 111 S.Ct. 1454]; *In re Clark* (1993) 5 Cal.4th 750 [21 Cal.Rptr.2d 509, 855 P.2d 729].)

Before us are three habeas corpus proceedings in which the process has been abused, not by the three inmates but by the attorney who was retained to prepare and file the petitions. As will become clear in this opinion, the attorney abused the writ process, and his clients, by filing frivolous habeas corpus petitions that have absolutely no chance of success. Not only has the attorney conceded that the petitions are patently frivolous and that one petition is also contemptuous, the attorney has admitted that before signing them and having them filed, he did not even read the petitions, which were prepared by law students or by another lawyer working in what can be characterized as the attorney's "writ mill." Simply stated, the attorney not only took money from these inmates and their families under false pretenses,

---

[*]Before Scotland, P. J., Nicholson, J., and Hull, J.

he gave them false hope that they had some possibility of success—hope that we must now dash because, as even the attorney concedes, the writ petitions are doomed to fail.

Thus, besides denying the writ petitions, we are faced with the question, does this court have the authority—as well as the responsibility to our legal system and to the inmates and families who retained this attorney—to sanction the attorney who abused the habeas corpus process by filing frivolous writ petitions? As we will explain, the answer to this question is "yes," with the understanding that sanctions should be imposed sparingly, in only the most egregious case, so as not to discourage use of the Great Writ.

These are such egregious cases. Consequently, we will sanction the attorney, Richard H. Dangler, Jr., by ordering him (1) to return to the clients who retained him the amount of money he received to file petitions for writs of habeas corpus in state courts on behalf of the three inmates, and (2) to pay monetary sanctions to this court to compensate it in part for the cost of processing, reviewing, and deciding the writ petitions and the orders that we issued directing Dangler to show cause why sanctions should not be imposed.

## SUMMARY OF PROCEDURAL BACKGROUND

In December 2003, Attorney Richard H. Dangler, Jr., filed in this court a petition for writ of habeas corpus on behalf of his client, Jackie Don White. Our review of the 96-page petition reveals it contains gross misstatements of fact, misrepresentations of law, and repetitions of appellate contentions long ago resolved against White. In addition, the petition accuses this court of ignoring the law and ruling against White in his earlier appeal because the court was biased in favor of the prosecution.

As reflected in our findings of fact, *post*, Dangler is not unfamiliar to this court. After being admitted as a member of the State Bar of California in 1988, he occasionally was appointed to represent indigent defendants on appeal in the Court of Appeal, Third Appellate District. In three appeals decided in 1991 and one decided in January 1992, this court found Dangler repeatedly misrepresented the facts of the cases and raised contentions that were frivolous on the merits or were barred for failure to raise them in the trial court.

Concluding that Dangler's work fell below the standard to be expected of reasonably competent appointed counsel, this court directed that Dangler be removed from the panel of attorneys who are appointed to represent indigent defendants on appeal in this district. Thereafter, Dangler continued to represent inmates before this court as retained counsel, and continued to raise misleading and meritless claims of error.

Over time it began to appear to this court that Dangler might be systematically misleading clients and abusing the writ process for his own pecuniary gain. This suspicion came to a head with Dangler's filing of the petition for writ of habeas corpus on behalf of inmate White that indisputably has no merit. The fact the White petition is so patently frivolous led this court to conclude that we must determine whether some action against Dangler is necessary to protect both his clients and the judicial system against his abuses of the writ process.

Consequently, this court ordered Dangler to show cause why he should not be required to pay monetary sanctions for filing a frivolous petition for writ of habeas corpus on behalf of White. And because the writ petition contains statements alleging that this court's rulings against White in his earlier appeal were based not on the law but on this court's bias in favor of the prosecution, Dangler was ordered to show cause why he should not be adjudged guilty of contempt of court and punished accordingly.

In his return to the order to show cause (OSC), Dangler concedes the writ petition is patently frivolous and contemptuous on its face. Acknowledging he has no defense to the imposition of sanctions for filing a frivolous writ petition, he offers "factors in mitigation in setting the amount of the monetary sanction." As to contempt, he tenders a defense that the writ petition was written by a lawyer who was working for Dangler and that because Dangler simply signed the petition without writing it or reading it, he did not have the mental state necessary for a finding of contempt.

After he filed the writ petition on behalf of White, but before we issued the OSC in the White proceeding, Dangler filed in this court a petition for writ of habeas corpus on behalf of his client, Melvin Richard Pena. Our review of the 37-page petition reveals it contains frivolous claims of error. Hence, we ordered Dangler to show cause why he should not be required to pay monetary sanctions for filing a frivolous petition for writ of habeas corpus on behalf of Pena. Dangler concedes the writ petition is patently frivolous, acknowledges he has no defense to the imposition of sanctions, and offers factors in mitigation with respect to the amount of monetary sanctions that should be imposed.

After we issued the OSC in the White proceeding, Dangler filed in this court a petition for writ of habeas corpus on behalf of his client, Renee Harris-Anderson. Our review of the 53-page petition reveals it contains frivolous claims of error. Hence, we ordered Dangler to show cause why he should not be required to pay monetary sanctions for filing a frivolous petition for writ of habeas corpus on behalf of Harris-Anderson. Dangler concedes the writ petition is patently frivolous and acknowledges he has no

defense to the imposition of sanctions. Again, he offers factors in mitigation with respect to the amount of monetary sanctions that should be imposed.

We consolidated the three cases for a hearing and ruling on the petitions and the OSC's. An extensive hearing was conducted on April 27, May 4, May 26, and June 30, 2004. Dangler appeared with counsel, who called and cross-examined witnesses, and presented documentary evidence. And the court compelled the attendance and testimony of certain witnesses.

## SUMMARY OF FINDINGS AND DISPOSITION

During the hearing, this court's questioning of witnesses revealed that Dangler has for some time been operating a writ mill, in which attorneys and essentially unsupervised law students have written petitions for writs of habeas corpus for filing in state and federal courts under Dangler's name. Dangler signed a great number of the petitions without reading them, and on some occasions a clerical employee signed Dangler's name on the petitions. Dangler generally received a $7,250 retainer to pursue habeas corpus relief. He paid law students up to $2,000 for their virtually unsupervised work on a client's case, or paid attorneys up to $2,500 per client. Thus, from each client, Dangler kept close to $5,000, less other overhead, for personally providing no legal service whatsoever.

In operating this habeas corpus writ mill, Dangler failed to supervise nonlawyers performing legal work, aided the unauthorized practice of law, and acted as a detrimental role model for a number of law students and young attorneys. Moreover, Dangler admitted that rather than depositing in a trust account the funds received from his clients, he deposited those funds in the general business account of an attorney named Roman Rector, whose office is in the same building as is Dangler's office.

Evidence also revealed Dangler had a State Bar of California (State Bar) disciplinary action pending against him.

During the course of the writ of habeas corpus proceedings in this court, Dangler voluntarily resigned, with charges pending, from the State Bar. Dangler asked, and this court agreed, that we would take into account his resignation from the State Bar and, in the interests of justice, we would discharge the OSC re contempt in the White proceeding.

Finding that the three petitions for writs of habeas corpus filed by Dangler on behalf of White, Pena, and Harris-Anderson are frivolous and fail to state a prima facie case for relief, we will deny them without prejudice, and further order that each petitioner may file a new petition for writ of habeas corpus in

the superior court, and that the period of time between the date the petitioner retained Dangler and the date upon which this decision becomes final will not be counted against the petitioner with respect to the delay in filing a new habeas corpus petition in the superior court.

Finding that the petitions for writs of habeas corpus are patently frivolous, we will impose monetary sanctions against Dangler as follows: (1) within 30 days after this opinion becomes final, Dangler must refund to each client in the White, Pena, and Harris-Anderson cases the amount of money Dangler received from the client to file petitions for writs of habeas corpus in state courts ($7,250 to each of the three clients, for a total of $21,750); and (2) within 30 days after this opinion becomes final, Dangler must pay to this court the sum of $25,000 to compensate the court in part for the cost of processing, reviewing, and deciding the three writ petitions and the orders to show cause why sanctions should not be imposed.

In the interests of justice, as stated above, we will discharge the OSC re contempt in the White proceeding.

## FACTS AND FINDINGS

### 1. *Dangler's Court-appointed Appellate Practice in This Court*

Dangler was admitted as a member of the State Bar in 1988. Thereafter, he occasionally was appointed to represent indigent defendants in criminal cases on appeal before this court.[1]

While testifying at the hearing in this court on the OSC's, Dangler claimed this was the first time he had ever been told by a court that a petition or pleading he filed was frivolous.

However, it later was revealed that in three appeals decided in 1991, this court issued opinions explicitly finding that Dangler had repeatedly misrepresented facts of the cases and raised contentions that were frivolous or were barred by the failure to raise them in the trial court. For example, in one case, this court stated that an appellate contention asserted by Dangler constituted a "gross mischaracterization of the record," and that other claims of error were "disingenuous" and "frivolous contentions that are nothing more than figments of appellate counsel's imagination." (*People v. Hale* (Mar. 4, 1991, C007733) [nonpub. opn.]; see also *People v. Rueda* (Mar. 19, 1991, C008621) [nonpub. opn.]; *People v. Munoz* (Nov. 26, 1991, C008492) [nonpub. opn.].)

---

[1] He also maintained a bankruptcy practice in federal courts.

And in January 1992, this court issued an opinion in another appeal in which Dangler represented an indigent defendant. Once again, this court found Dangler's performance was appalling. After describing his claims of error, in order, as "frivolous," "utterly baseless and grossly misrepresent[ing] the record," "trifl[ing] with this court," "another frivolous contention," "another instance of misleading this court," "a baseless assertion," and "flagrantly misrepresent[ing] the record," the opinion stated that Dangler was either "unable to comprehend the record or [was] intentionally attempting to mislead this court." The opinion concluded that Dangler had repeatedly mischaracterized the record, engaged in unprofessional conduct, undermined his own credibility, failed to further his client's interests, and set a bad example for his client, a minor. (*In re Richard J.* (Jan. 3, 1992, C010255) [nonpub. opn.].)

On January 7, 1992, then-Presiding Justice Robert K. Puglia wrote to the director of the Central California Appellate Program (CCAP), which oversees appointment of counsel on appeal, informing CCAP that Dangler's work fell below the standard to be expected of reasonably competent appointed counsel (as demonstrated by the decisions in *Richard J.*, *Munoz*, *Rueda* and *Hale*), and directing CCAP to remove Dangler from the panel of attorneys available for appointment to represent indigent defendants in appeals before this court.

## 2. *Dangler's Habeas Corpus Practice in This Court*

Following his removal from CCAP's appointed-counsel panel, Dangler continued representing inmates before this court, albeit as retained counsel in habeas corpus proceedings.

During the hearing on the OSC, Dangler testified that "through a lot of hard personal work," he has obtained favorable results for "a number of" his clients in habeas corpus proceedings. In support of this claim, he introduced into evidence a list of the petitions for writs of habeas corpus that he has filed in this court.[2]

The list shows that from December 1992 to April 2004, Dangler filed 53 habeas corpus petitions in this court, including the three admittedly frivolous petitions filed in these consolidated actions. As to the other 50 petitions, this court summarily denied 47 of them, without having ordered opposition from the Attorney General, because each petition failed to state a prima facie case for relief.[3] One of the petitions was summarily denied after the receipt of

---

[2] Dangler also testified that he achieved favorable results for habeas corpus clients in 13 cases in other state and federal courts.

[3] Case Nos. C014919, C015426, C015763, C018983, C019601, C021809, C026503, C026878, C027005, C027078, C027113, C027226, C028162, C028387, C029938, C031021,

opposition from the Attorney General. (*In re Jack*, C035659.) As to another petition, this court issued an order to show cause returnable to the superior court; however, that habeas corpus petition was actually drafted by the petitioner inmate in propria persona, who simply substituted in Dangler as his attorney after this court determined that the petition stated a prima facie case and requested opposition from the Attorney General. (*In re Smith*, C034372.)[4] With respect to the remaining petition, this court summarily rejected six of seven contentions, but remanded the matter to the trial court to exercise sentencing discretion pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628]. (*In re Jones*, C038074.)

In other words, contrary to his claim that he has obtained favorable results for "a number of" his habeas corpus clients in this court, Dangler achieved success in only one of the 53 petitions he filed over nearly a 12-year period. Of course, as we have noted, because rules of law favor the finality of judgments, it is not easy to show that an inmate is entitled to a writ of habeas corpus. Hence, we do not necessarily equate the failure to state a prima facie case for relief with frivolousness, or with incompetence of the attorney representing the petitioner. However, Dangler's lack of success is relevant to these proceedings for two reasons: (1) it impeaches his testimony during the hearing on the OSC's and thus bears generally upon his credibility in other respects, and (2) it demonstrates why it appeared to this court that he might be systematically misleading his clients and abusing the writ process for pecuniary gain.[5]

And, as described below, this is not the first habeas corpus proceeding in which Dangler has faced an accusation of contempt, a fact of relevance to this proceeding for reasons that follow.

---

C031581, C032001, C033144, C033555, C034498, C035068, C036434, C037125, C037289, C037490, C037619, C037897, C037932, C040214, C042015, C042520, C042677, C043486, C043487, C043489, C043887, C044019, C044312, C044380, C044750, C045540, C045541, C046095, C046267, C046329, C046444.

[4] Dangler filed a reply to the Attorney General's opposition, but the reply simply repeated and expanded on a meritorious issue identified in the pro se habeas corpus petition.

[5] In the hearing on the OSC's, Dangler raised a due process objection, asserting we "blindsided" him with evidence about his legal career and practice. The objection has no merit. The pleadings and opinions filed by this court are public matters, of which both Dangler and this court were obviously aware. And Dangler put his legal career and practice at issue by falsely testifying he had never before been notified by a court that he had filed a frivolous petition or other pleading, and further testifying that he had obtained favorable results for a number of his habeas corpus clients and introducing a list of every habeas corpus petition he had filed in this court.

### 3. *Dangler's Prior Contempt Hearing in This Court*

In December 2000, this court issued an order directing Dangler and Eric Wagner, an employee of Dangler's, to show cause to why they should not be held in contempt for Dangler's allowing Wagner, an attorney suspended from the State Bar, to appear for Dangler in oral argument before this court. (*People v. Lepeilbet*, C033832.) After a hearing, an order was issued on February 6, 2001, holding Wagner in contempt but finding Dangler not guilty of contempt.

Although absolving Dangler of contempt, this court expressed grave concern about Dangler in the following words: "The record suggests Mr. Dangler may have been grossly negligent or reckless in hiring Mr. Wagner in January 1998, retaining him for nearly three years until late December 2000, and allowing him to perform oral argument in this court on December 12, 2000; Mr. Dangler did not know Mr. Wagner was an active attorney entitled to practice law; and Mr. Dangler knew or should have known [that] Mr. Wagner was not actively licensed to practice law. The record suggests Mr. Dangler made virtually no effort, either before or after hiring Mr. Wagner, to establish whether Mr. Wagner was in fact an actively licensed attorney. [¶] The record also indicates Mr. Dangler's health problems continue to severely impair his ability to oversee the day-to-day operations of his law practice and to supervise his attorney and non-attorney staff. Mr. Dangler asserts he is 'too sick to run a business, yet still well enough to supervise it and keep it going from the sickbed, as it were.' He contends his law office is 'just so set up that it has been able to meet all its obligations in spite of [Mr. Dangler] being unable to work in the office in the normal way.' The validity of his assurances is doubtful." (*People v. Lepeilbet*, C033832, order filed Feb. 6, 2001; fns. omitted.)[6]

### 4. *Proceedings Against Dangler Before the State Bar*

In his return to the initial OSC in these proceedings, Dangler disclosed that there was a disciplinary action pending against him before the State Bar, and included a copy of a letter he received from its office of the chief trial counsel. The letter reflects that, in exchange for a proposal by the State Bar to settle four disciplinary matters pending against him, Dangler agreed he had committed several violations of the Rules of Professional Conduct and the Business and Professions Code. Specifically, he admitted that he (1) violated Business and Professions Code section 6090.5 by "requesting that [a certain] State Bar matter be dismissed in exchange for money," (2) violated the Rules of Professional Conduct, rule 3-310(F) by "accepting money from [a] third

---

[6] We take judicial notice of the record in *People v. Lepeilbet*, C033832.

party without informed consent," (3) violated Business and Professions Code section 6068, subdivision (m) by "fail[ing] to [c]ommunicate" with a client, and (4) violated the Rules of Professional Conduct, rule 3-110(A) by "fail[ing] to properly supervise office staff."

### 5. *Dangler's Representation of White in the Superior Court*

#### (a) *The Superior Court Habeas Corpus Petition*

. In September 2000, Dangler signed an attorney's employment agreement with Ralph White, the brother of Jackie Don White, providing that for payment by Ralph White to Dangler of $7,250, Dangler would file a petition for writ of habeas corpus on behalf of Jackie Don White in the superior court and then, if necessary, in the California Court of Appeal and the California Supreme Court. At some point, Ralph White had lunch with Dangler and Attorney James Locke. During lunch, Dangler said that Locke would be the attorney handling most of the work on the habeas corpus petition.[7]

Dangler had hired Locke in the beginning or middle of 2001, i.e., prior to June or July 2001, to draft habeas corpus petitions. Locke had a history of suspensions by the State Bar. On September 1, 2001, a few months after Dangler hired him, the State Bar placed Locke on inactive status, and then suspended him from the practice of law from October 10, 2001, until March 10, 2002.

Despite this court's then-recent criticism of Dangler for employing another inactive attorney who performed legal services,[8] Dangler failed to notify the State Bar, as required by rule 1-311(D) of the Rules of Professional Conduct of the State Bar of California, that he employed Locke at the time Locke was made inactive and then was suspended.[9]

Locke worked on the superior court habeas corpus petition prior to the summer of 2002, when Dangler fired Locke because he was not getting much work done. At this point, the petition was turned over to law student Brian Haddix for formatting, spell checking, and clerical preparation.

---

[7] This court was unable to obtain any evidence from Locke regarding his work on the petition, and Dangler's knowledge thereof, because Locke is deceased.

[8] See *Dangler's Prior Contempt Hearing in This Court, ante.*

[9] Dangler testified he was unaware that Locke was suspended by the State Bar. But Brian Haddix, one of the law students whom Dangler hired as law clerks, testified he remembers hearing through "general office talk" that Locke was suspended from the practice of law.

Haddix made no substantive changes to the petition. The petition then sat in the office copy room for some time before it was copied and bound for filing in the superior court.[10]

Dangler admits he did not read the 112-page petition and memorandum of points and authorities, but nonetheless signed it. Dangler dated the petition October 24, 2002, and filed it in the San Joaquin County Superior Court on October 30, 2002. He also admits he did not tell White, or his brother Ralph, that he signed and filed the petition without reading it. The superior court habeas corpus petition is quite similar to the petition later filed on White's behalf in this court, and includes the same contemptuous language, which we will discuss in detail later in this opinion.

(b) *Dangler's Reasons for Signing the Petition Without Reading It*

Dangler testified that he knew it was "wrong" and negligent for him to sign a habeas corpus petition he had not read, but he offered three reasons for having done so with the White petition filed in the superior court.

First, Dangler testified he thought he could rely on Locke, whom he viewed as an experienced attorney. However, the evidence showed that Locke had a history of suspensions by the State Bar before Dangler hired him. And the State Bar placed Locke on inactive status and then suspended him for nearly six months shortly after Dangler hired him. Nevertheless, Locke apparently worked on the superior court habeas corpus petition on behalf of White during that time.[11]

Second, Dangler testified he signed the petition without reading it because he employed a "writ manager," an attorney named Angela Kung, who was supposed to review the petition before Dangler signed it. He described Kung as a competent attorney who provided "experienced supervision." However, he acknowledged that Kung was not admitted to the State Bar until December 3, 2001, and thus had been an attorney for only about 10 months when the White petition was filed in the superior court. Moreover, Dangler admitted he does not know whether Kung actually reviewed the petition. Indeed, Haddix testified credibly that it was not Kung's job to review the habeas corpus petition written by Locke, as Locke was himself an attorney.

---

[10] It appears that Locke worked on the White petition while he was suspended from the practice of law. Haddix, who worked for Dangler from February to August 2002, testified he never met Locke, who was not in the office, "was already on his way out when [Haddix] got there," and "wouldn't be returning." Haddix was sent into Locke's office to retrieve completed habeas corpus petitions from Locke's computer, which Haddix would then prepare for filing. Another law clerk, who started working for Dangler in May 2002, also testified Locke was not working in the office at that time.

[11] See footnote 9, *ante.*

Third, Dangler testified he signed the petition without reading it because of his health problems. According to Dangler, he suffered some cognitive problems after sustaining a head injury in June 2000. In early 2001, he thought his health was improving and he would be fine. But later in 2001, he began to suffer dizziness, fatigue, and pain, and doctors tested him for multiple sclerosis. He was having dizzy spells and difficulty focusing, which greatly impaired his ability to read anything. He testified that "sometimes" he was incoherent.

In support of his testimony, Dangler introduced a letter from a neurologist, dated February 25, 2002, stating (1) Dangler said he continued "to have difficulties at work"; (2) testing showed Dangler's memory for acquisition and recall was normal, but his "[d]elayed recall" was in the poor range; and (3) Dangler had some degree of impulsivity and problems with attention and organization. The neurologist opined Dangler suffered from "a significant degree of cognitive impairment that is most likely related to previous head injury, but possibly from demyelinating multiple sclerosis."

Dangler also provided substantial medical documentation that he began to suffer from back pain in August 2002, which was the onset of a debilitating spinal infection, vertebral osteomyelitis. His condition left him bedridden in December 2002. The condition was not diagnosed until January 2003, when he was hospitalized. While bedridden at home, he received intravenous antibiotics and was treated by a home healthcare nurse for about eight weeks, starting in January 2003. By May 2003, Dangler told his doctor that he had minimal back pain, and denied having any numbness or weakness.

In addition, Dangler presented an April 2003 radiology report of the results of a nuclear medicine "brain SPECT study," which states its findings are "highly suggestive of Alzheimer's disease." Despite this report and the intervening year since it was issued, Dangler did not introduce any evidence that a doctor has diagnosed him with Alzheimer's disease.

Although Dangler introduced substantial evidence that he has suffered from severe health problems, he did not present evidence or argue that his health problems resulted in cognitive impairment that precluded him from recognizing his ethical and professional obligations as an attorney. In fact, while testifying, Dangler demonstrated an ability to recall specific details regarding his work on past cases when those details served his own interests. Nothing in his demeanor, his manner of testifying, or the content of his testimony suggested that he failed to understand, or has been incapable of understanding, his duties to his clients.

In any event, even if we credit Dangler's testimony that his ability to read was impaired at times due to his health problems, this fails to explain why

Dangler did not ensure that a competent attorney in his employ reviewed and signed the petition, or why he did not associate competent counsel to do so.

### 6. *Dangler's Law Practice Since 2001*

In part, Dangler attempts to shift the blame onto his staff for his law firm's failings. In Dangler's words, after his health declined, "the quality of my staff much to my deep regret, declined as well"; "people who came to work there stopped listening to me, following direction, or paying . . . attention"; "people weren't taking their jobs very seriously sometimes when I wasn't well enough to be there to see that they should"; and "[p]eople just didn't seem to want to work hard enough."

To the contrary, the evidence establishes that Dangler failed to supervise his nonattorney staff and failed to make arrangements for their supervision. He admitted that, for the last few years, he has signed numerous habeas corpus writ petitions without first reading them, and that he has done so in perhaps 50 percent of his cases. And evidence showed that many of the petitions Dangler admittedly signed without reading, including the White petition filed in this court, were drafted or revised by law students without attorney supervision.

Dangler hired law student Frederick Charles Thomas as a law clerk in September 2001.[12] When Thomas was hired, Angela Kung was employed by Dangler as the writ manager. Thomas would draft habeas corpus petitions and give them to Kung for her review; Kung provided him with guidance and answered his questions. He believed that Kung was an attorney. As he gained experience, Thomas assumed that the petitions he wrote were ready for filing, absent further input from his supervisor. He never spoke to Dangler about the petitions he drafted; he never received in writing any criticisms or editing from Dangler on the petitions; and he was unaware whether Dangler read any of them.[13] Dangler did, however, sign the writ petitions that Thomas drafted.

Kung did not actually become an attorney until December 3, 2001. Dangler testified he employed Kung in 2001, before she was admitted to the State Bar, but he claimed that Kung did not become writ manager until after she became an attorney. However, Thomas's testimony establishes that Kung was supervising him when he started working for Dangler in September 2001.

---

[12] Thomas initially testified Dangler hired him in September 2002, but he later recalled he started working for Dangler in September 2001, at the time of the terrorist attacks on the World Trade Center.

[13] The only substantive discussion Thomas recalled having with Dangler about a habeas corpus petition occurred when a hearing in federal district court was scheduled. Dangler gave Thomas a brief overview of the substance of the habeas corpus petition and asked him to help Roman Rector prepare to appear at the hearing because Dangler was ill.

Thus, for at least a three-month period at the end of 2001, Dangler had a nonattorney supervising a nonattorney in preparing habeas corpus petitions for filing in courts, without any attorney supervision.

Dangler employed law student Brian Haddix as a law clerk from approximately February through August 2002. Haddix was assigned the clerical task of preparing for filing between 15 and 20 habeas corpus petitions drafted by James Locke. Although Haddix asked Kung for help when he had questions about submitting a petition, he did not give the 15 to 20 writ petitions to her for review before filing because they had been drafted by another attorney, Locke. According to Haddix, while it is possible he may have submitted some of the petitions to Kung, he normally would tell Dangler when one of Locke's petitions was prepared and ready to go. Haddix would leave only the signature page of the petition for Dangler to sign, and then would incorporate the signature page into the finished writ petition.

In May 2002, Dangler hired another law student, Carolyn Stacey Livingston, who worked for him until March 2004. Livingston was admitted to the State Bar on December 3, 2003, while still working for Dangler. Livingston testified that before she became an attorney, she worked on close to 50 habeas corpus petitions for Dangler, including redrafting the White petition that was filed in this court. Dangler knew Livingston was not an attorney at the time she redrafted the White petition.

Livingston thought that Dangler did not read the majority of the many habeas corpus petitions she had drafted or redrafted. She would leave them for him in a back room, and he would sign them. She assumed that Dangler did not read them because Livingston first submitted the petitions to a writ manager, who would read them and return them to her, and because Dangler never made any changes to the petitions.

Dangler paid Livingston $250 to redraft habeas corpus petitions for refiling in an appellate court after the original petitions were denied by the superior court. She was paid more for drafting the original petitions for filing in the superior court.

In September 2002, law student Cecilia Tsang began working for Dangler as a law clerk. Tsang testified that Attorney Roman Rector interviewed her and told her she was hired. Rector also wrote out her paychecks, but Tsang understood she was working for Dangler. Rector told Tsang she would be writing and filing writ petitions. When Tsang started work, Angela Kung was the writ manager and the sole attorney working for Dangler. Rector had his own law firm, handling personal injury and bankruptcy actions. Rector did not involve himself in the filing of habeas corpus petitions, but he did attend

two hearings set in habeas corpus proceedings because Dangler was unavailable. In his testimony, Dangler conceded that Rector had no experience with habeas corpus.[14]

As a law clerk before she was admitted to the State Bar, Tsang drafted original habeas corpus petitions for filing in trial courts. Kung provided some training for Tsang regarding how to spot issues, find legal arguments, and prepare and file petitions. Dangler also talked to Tsang about specific cases and issues on occasion.

Tsang testified that although Dangler signed the petitions she prepared, she saw him read only one of them—the very first petition she worked on in September or October 2002. Throughout her employment by Dangler, she took her completed writ petitions to him, if he was available, and he would sign them without reading them. When Dangler was not in the office, Tsang took the petitions to a nonattorney employee named Jim, who would sign Dangler's name on the petitions, also without reading them. Tsang was aware that other law clerks also had Jim sign Dangler's name on habeas corpus petitions.

In response to Tsang's testimony, Dangler stated, "I don't know who she's talking about," and denied that a nonattorney named Jim signed habeas corpus petitions in his absence. But later in his testimony, Dangler admitted he employed a bankruptcy paralegal named Jim Moore. When asked what Moore would say if called as a witness, Dangler responded, "I have no idea what he'll tell you." Dangler also testified that he had authorized Angela Kung and another attorney in the past to sign his name on petitions.

We find Dangler's denial that he authorized his paralegal to sign habeas corpus petitions in his absence is not credible given Dangler's demeanor during this testimony, his other prevarications, and the inconsistency in his first testifying that he had no idea whom Tsang was talking about, but later admitting that he employed a paralegal named Jim.

Angela Kung left Dangler's office in the middle to late December 2002. Cecilia Tsang was not admitted to the State Bar until March 2003. During the three-month time period between December 2002 and March 2003, no attorney was employed in Dangler's office and Dangler was absent due to illness. Nevertheless, Tsang and three law students working for Dangler continued to prepare habeas corpus petitions and to file them in courts.

---

[14] We take judicial notice of records of the State Bar, posted on its official Web site, which show Christopher Roman Rector, State Bar No. 212244, was admitted to practice law in California on January 10, 2001, and he is employed by the Law Office of C. Roman Rector, at 3102 O Street, Sacramento. [http:// members.calbar.ca.gov/search/member_detail.aspx?x+212244] Dangler's law office also is located at 3102 O Street.

Tsang was not promoted to writ manager until May 2003. Thus, her testimony established that from the middle of December 2002 until May 2003, Dangler's law clerks continued to prepare and file writ petitions outside the supervision of any member of the State Bar, other than Dangler. And during that time period, Dangler would sign the petitions without reading them if he was in the office; otherwise, the paralegal, Jim, would sign Dangler's name to them.[15] Even after Tsang became writ manager, the law students would get Dangler or Jim to sign their petitions.

Tsang testified that at some point after Kung left the office, Tsang became concerned that no one was in charge, mail was coming in, and no work was being done on cases. Tsang learned deadlines had been missed in several cases that had been left sitting on Kung's desk. Thus, Tsang approached Rector and offered to become writ manager. Rector agreed to promote her to writ manager in May 2003, and Tsang received a pay raise.

Tsang proposed to Rector that, as writ manager, she would be responsible for organizing case files and calendaring cases. Tsang testified that neither Rector nor Dangler told her she was to review the substance of habeas corpus petitions written by the law students. Rather, Dangler explained that she was to keep in contact with clients and make sure petitions were timely filed. Tsang also was responsible for answering questions asked her by the law students.

According to Tsang, if during her tenure as writ manager, a law student employee asked her a question about a habeas corpus petition, she would answer it; the law student would prepare the petition and, although Tsang would make sure it was timely filed, she would not review the legal analysis or writing of the petition. Dangler testified he told Tsang that, as writ manager, she was responsible for reading and reviewing every petition and that she was supposed to inform him if there was a problem with a petition. Haddix, who worked for Dangler before Tsang began her employment in the office, testified that every writ petition had to be reviewed and approved by a supervising attorney. Livingston, who rewrote the White petition for filing in this court, testified that while she was a law clerk for Dangler before becoming an attorney, she "generally" submitted "most of" her work to a writ manager who read it and returned it to her. However, Tsang testified that she never read the White petition.

---

[15] Dangler testified he had attorneys working in his office between December 2002 and March 2003, and he had an attorney supervising the law clerks between December 2002 and May 2003. However, when pressed to identify any attorney he employed during this time period, Dangler was unable to name anyone, other than Roman Rector. Yet, Dangler conceded that Rector did not have either the knowledge or the experience to supervise persons working on habeas corpus petitions.

The evidence revealed that Dangler was not around the office very often from December 2002 through May 2003, but that he was in the office more often toward the end of 2003. On occasion, Tsang would call Dangler at home with questions. When she spoke with him, Dangler seemed mentally competent to address legal issues and to deal with the business of law. At the end of November 2003, Rector told Tsang she would no longer be the writ manager because Dangler intended to take a more active role in overseeing the writ petitions. Tsang ceased working for Dangler in December 2003.

During the 15 months she worked for Dangler as a law student and then an attorney, Tsang prepared approximately 30 original writ petitions for filing in the superior court. She also redrafted petitions for filing in higher courts, and she took over some cases when other employees left Dangler's firm. During the seven months she served as writ manager, Tsang oversaw the filing of "a good number of cases," up to 100 petitions, many of which were prepared by law students.

Dangler paid Tsang on a contract basis. Before Tsang was admitted to the State Bar, Dangler paid her a flat fee of $1,500 to prepare and file a habeas corpus petition in a superior court, and $250 to redraft a petition for filing in a state appellate court. After Tsang was admitted to the State Bar, Dangler paid her $2,000 for each original petition prepared and filed in a trial court, plus $250 for each "subsequent filing." When Tsang was promoted to writ manager, Dangler paid her an additional $1,500 per month. Dangler testified this was his customary arrangement with his employees, i.e., he paid law clerks $1,500 and attorneys $2,000 for original superior court habeas corpus petitions, and paid an additional $250 for each "refiling" in a state appellate court.

Dangler testified his standard retainer fee was $7,250 per habeas corpus petition, which included filing an original petition in the superior court and then, if necessary, refiling a petition in the California Court of Appeal and the California Supreme Court.[16] He charged a "separate and similar" fee to file petitions for writs of habeas corpus in the federal courts. Even before examining the trial or appellate court records, Dangler agreed to file a habeas corpus petition in every case in which a client paid the $7,250 fee. Dangler could not recall ever determining that there was no basis for a petition after accepting the retainer. According to Dangler, he offered his clients the option of paying him only $2,500 to review the record, and then an additional $6,000 if he recommended the filing of a petition, but most of them opted to pay him $7,250 to go ahead and file a petition.

---

[16] Dangler testified that he charged between $8,000 and $8,500 in a few cases and $12,500 in one case, but that his customary retainer fee has been $7,250 for state court filings.

Dangler testified that, in March 2002, he sold his bankruptcy practice to Rector, who since then has paid Dangler a "pension" of $300 per month. In about June or July 2002, Dangler closed his own bank accounts and began to use Rector's general business account. Dangler would deposit funds received from clients into Rector's general account, which was not a client trust account, and would have Rector pay Dangler's expenses, including employee compensation, from Rector's account. Because Dangler took the position that his employees were independent contractors, he did not withhold taxes or pay Social Security.[17]

### 7. Dangler's Representation of White in This Court

#### (a) The Petition for Writ of Habeas Corpus

On December 17, 2003, Dangler filed in this court a 96-page petition for writ of habeas corpus and memorandum of points and authorities with supporting exhibits on behalf of White in *In re White*, C045684. The cover of the petition contains Dangler's name as "Attorney for Petitioner." The petition contains a verification signed by White, but both the petition and its memorandum of points and authorities contain Dangler's signature, and are dated, in handwriting, November 26, 2003. The petition contains a proof of service dated December 17, 2003. Dangler initially testified he was uncertain whether the signature on the petition was his, but in later testimony he said he was sure he signed the petition.

#### (i) The Petition's Contemptuous Language

At pages 14 and 15, the petition states: "The Third District Court of Appeals [sic] ignored these findings of the trial court when they [sic] issued their [sic] rulings [sic]. The Appellate Court admitted that they [sic] did not have the authority to apply the felony murder rule to Petitioner because the deceased Gray was a co-conspirator to the January 17, 1992, robbery. (*People v. White* (1995) 35 Cal.App.4th 758, 763–764 [41 Cal.Rptr.2d 510].) Instead of dismissing the first-degree murder charge against Petitioner, the Third District Court of Appeals [sic] stepped in and held that the Petitioner was actually guilty of 'implied malice' because of the acts of the Petitioner

---

[17] Although the issue remains unsettled (see Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2003) ¶¶ 9:107–9:109, pp. 9-13 to 9-15), one court has held that an attorney's failure to maintain advance payment retainer fees in a separate client trust account until earned violates rule 4-100(A) of the State Bar Rules of Professional Conduct and, thus, constitutes a breach of fiduciary duty and professional negligence. (*T & R Foods, Inc. v. Rose* (1996) 47 Cal.App.4th Supp. 1, 6–8 [56 Cal.Rptr.2d 41].) In any event, Dangler's act of depositing his clients' payments into another law firm's general business account raises questions of other potential ethical and tax violations that are beyond the scope of this proceeding.

and co-Defendant Herbert. (*Ibid.*) Further, the Court opined that the use of the felony murder rule this [*sic*] was 'harmless error.' (*Ibid.*) Thus, the Third District Court of Appeals [*sic*] ameliorated the effects of the malpractice of the District Attorney at the expense of 'logic' and reputation of the California Courts. Instead of demonstrating a 'neutral' posture, the Third District Court of Appeals [*sic*] bent over backward to come to the aid of a fallen comrade, which is the San Joaquin County District Attorney. The California Appellate Courts are paying a high price for the loss of reputation when they abjectly and blindly side with the District Attorney despite the fact that the wounds the District Attorney sustained were entirely self-inflicted. The decision of the Third District Court of Appeals [*sic*] was not based on logic; it was based on a need to shore up the District Attorney's mistakes."

Dangler concedes this language constitutes contempt of court.

(ii) *The Petition's Contentions*

The petition sets out 25 contentions that are organized under 10 captions numbered roman numerals II to XI, discussed below.

In most respects, the petition filed in this court is the same as the petition filed on White's behalf in the superior court, but there are several differences. The table of contents pages are formatted and lettered differently. The table of contents page for the petition filed in this court contains an additional argument at VIII.C, regarding the population of San Joaquin County, yet that argument is not included in the body of the petition filed in this court. Although the petition filed in the superior court contains arguments why it is not time-barred, the petition filed in this court contains a template for such arguments but no substantive arguments (see discussion, *post*).

The petition filed in the superior court had 64 footnotes, many of them lengthy, all of which were removed from the petition filed in this court. The petition filed in this court contains a substantial modification of a claim made in the superior court that trial counsel was ineffective for failing to test the contents of a certain piece of evidence. A claim of ineffective assistance of trial counsel in failing to investigate a witness named Rossiter was added to the petition filed in this court. And the petition filed in this court argues we should issue a subpoena duces tecum, another contention that was not included in the petition filed in the superior court.

Most significantly, although the petition filed in the superior court contains the verbatim contemptuous language found on pages 14 and 15 of the petition filed in this court, the petition filed in the superior court includes a cite to "(Exhibit DDD, Appellate Opinion, hereafter, 'Exhibit DDD')" at the end of

the first sentence of the passage, while that cite has been deleted from the contemptuous language in the petition filed in this court.

And, the petition filed in this court includes an additional argument addressing the superior court's order denying the petition. This additional argument repeats an edited version of the language that Dangler concedes is contemptuous.

### (b) *Dangler's Concession that the White Petition is Frivolous*

During the hearing on the OSC's, Dangler repeatedly conceded that the contentions raised in the White petition are patently frivolous in that they indisputably have no merit (*In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 650), and further conceded that he can be ordered to pay monetary sanctions deemed appropriate by this court for his filing the frivolous petition.

As previously noted, Dangler admits he was paid $7,250 to represent White in the habeas corpus proceedings.

### (c) *Dangler's Defense to the Charge of Contempt*

As we have noted, Dangler concedes that the language quoted above (pt. 7(a)(i), *ante*) is contemptuous, and he apologizes for its presence in the White petition. However, he argues he cannot be held in contempt of court because, although he signed the petition, he did not know the contemptuous language was included in it.

According to Dangler's testimony, the contemptuous language was drafted by Locke and included in the superior court petition; Livingston reviewed the case for refiling in this court, added an argument to the end of the brief, and incorporated the contemptuous language into the petition filed in this court, but neglected to read the contemptuous language; and Tsang, the writ manager at the time who was responsible for reviewing all petitions, either neglected to do so in this case or neglected to inform Dangler of the contemptuous language.

After being confronted with the fact someone made numerous changes to the writ petition that had been filed in the superior court before it was "refiled" in this court, including editing the contemptuous passage (as outlined above), Dangler speculated that the changes were made either by Haddix, Livingston, or Tsang.

Haddix, of course, could not have made the changes because he left his employment with Dangler before the petition was filed in the superior court.

Livingston testified that at the time she worked on the petition for filing in this court, she was a law student awaiting the results of the State Bar examination. According to Livingston, to prepare the petition for "refiling" in this court, she followed her usual practice of incorporating the language from the petition filed in the superior court, reading the superior court's order denying the petition, and adding one final argument to the petition to address the superior court's reasons. She claimed that although she incorporated the superior court writ petition into the petition to be "refiled" in this court, she did not read the entire petition, and that in drafting the final argument, she simply copied language from earlier portions of the petition and pasted that language into the final argument, again without reading the language.[18] As to the numerous differences between the petition filed in this court and the petition filed in the superior court, Livingston suggested that they were likely the result of her using a nonfinal draft of the superior court petition, found on the office computer, when she prepared the petition for "refiling" in this court. Although she earlier testified that the petitions she prepared usually were read by an attorney, who sometimes would make changes, Livingston opined that Tsang, the writ manager, made no changes to the White petition filed in this court because if Tsang had done so, she would have told Livingston.

Tsang testified she was still the writ manager on November 26, 2003, the date Dangler signed the White petition for filing in this court. Claiming her job duties as writ manager did not include reading all of the petitions drafted by law students, Tsang denied reading or working on the White petition. She testified that if she had read the petition, she immediately would have recognized that the language on pages 14 and 15 was contemptuous and she would have changed it.

*8. Dangler's Representation of Pena in This Court*

On March 5, 2004, while the White petition was pending in this court but before he was served with the OSC in that proceeding, Dangler filed a petition for writ of habeas corpus on behalf of Melvin Richard Pena, in case No. C046271. The petition and attached memorandum of points and authorities contain Dangler's signature. They raise two contentions, both of which were rejected on Pena's direct appeal. As described below, one part of the Pena petition plagiarizes from the appellant's opening brief drafted by another attorney in Pena's direct appeal, and another part of the petition relies on appellate authority that has been overruled.

---

[18] We find Livingston's testimony that she incorporated the contemptuous language into the petition without reading it was not credible.

(a) *His Concession that the Pena Petition is Frivolous*

During the hearing on the OSC in the White proceeding, this court served Dangler with an OSC why he should not be ordered to pay monetary sanctions for filing a frivolous petition on behalf of Pena.

Dangler concedes that the contentions raised in the Pena petition are patently frivolous in that they indisputably have no merit, and further concedes that he can be ordered to pay monetary sanctions deemed appropriate by this court for his filing the frivolous petition. He presented no evidence as to who drafted the petition and whether he read it before signing the petition.

Dangler admits he was paid $7,250 to represent Pena in the habeas corpus proceedings.

### 9. *Dangler's Representation of Harris-Anderson in This Court*

On April 21, 2004, about a month *after* this court served him with the OSC in the White proceeding, Dangler filed a habeas corpus petition on behalf of Renee Harris-Anderson, in case No. C046677. The petition and its memorandum of points and authorities contain Dangler's signature. Among other things, discussed below, the petition misrepresents the appellate record and relies on overruled appellate authority.

(a) *His Concession that the Harris-Anderson Petition is Frivolous*

During the hearing on the OSC in the White proceeding, this court served Dangler with an OSC why he should not be ordered to pay monetary sanctions for filing a frivolous petition on behalf of Harris-Anderson.

Dangler concedes that the contentions raised in the Harris-Anderson petition are patently frivolous in that they indisputably have no merit, and further concedes that he can be ordered to pay monetary sanctions deemed appropriate by this court for his filing the frivolous petition. He presented no evidence as to who drafted the petition and whether he read it before signing the petition.

Dangler admits he was paid $7,250 to represent Harris-Anderson in the habeas corpus proceedings.

### 10. *Dangler's Resignation from the State Bar*

On May 26, 2004, during the hearing on the OSC's, Dangler asked us to discharge the OSC re contempt in the interests of justice because, he said, he intended to resign immediately from the State Bar.

Dangler was advised that this court has no authority over his status as a member of the State Bar and that the purpose of the proceedings on the OSC's is not to require him to resign from the State Bar. Dangler acknowledged that his decision to resign was his own idea and that he had made this decision knowingly, intelligently, and voluntarily, after a full opportunity to consult with counsel, and with no coercion by this court.

Dangler has subsequently presented us with an order of the California Supreme Court, filed on August 4, 2004, which specifies, "The voluntary resignation of RICHARD HALE DANGLER, JR., State Bar No. 133362, as a member of the State Bar of California is accepted without prejudice to further proceedings in any disciplinary proceeding pending against [Dangler, i.e., State Bar Court Case No. 04-Q-12632] should he hereafter seek reinstatement," and which orders him to comply with the duties imposed upon a person who resigns from the State Bar. (Cal. Rules of Court, rule 955.)

11. *Continuance for Further Evidence and Argument*

At the conclusion of the hearing on May 26, 2004, this court stated that in light of Dangler's intention to voluntarily resign from the State Bar, we would, in the interests of justice, discharge the OSC re contempt upon the conclusion of these proceedings.

We then continued the hearing for one month to allow Dangler to present any additional evidence or argument he may have regarding the imposition and amount of sanctions for the filing of these three frivolous petitions for writs of habeas corpus.

On June 30, 2004, Dangler presented argument but no additional evidence, and the matter was taken under submission.

## CONTEMPT

We accept Dangler's concession that the above quoted language included at pages 14 to 15 of the White petition filed in this court is contemptuous.

"[I]t is the settled law of this state that an attorney commits a direct contempt when he impugns the integrity of the court by statements made in open court either orally or in writing. [Citations.] Insolence to the judge in the form of insulting words or conduct in court has traditionally been recognized in the common law as constituting grounds for contempt. [Citation.]" (*In re Buckley* (1973) 10 Cal.3d 237, 248 [110 Cal.Rptr. 121, 514 P.2d 1201], fn. omitted.) "[T]he power of a court to punish by contempt an act

which impugns its integrity exists independent of statute." (*Id.* at p. 248, fn. 14.) Thus, it is not necessary that the contemptuous statement interrupted the due course of a trial or other judicial proceeding. (*Ibid.*)[19]

■ Accordingly, it is contemptuous for an attorney to say or imply that the court knows the law but has deliberately chosen not to follow it. (See, e.g., *In re Buckley, supra*, 10 Cal.3d at p. 250 [upholding contempt finding against attorney who said in open court, " '[t]his Court obviously doesn't want to apply the law' "].) It is likewise contemptuous for an attorney or party to make the unsupported assertion that the court is acting out of bias toward a party. (See, e.g., *Hume v. Superior Court* (1941) 17 Cal.2d 506, 510–511, 515 [110 P.2d 669] [attorney held in contempt for filing civil complaint and affidavit asserting the trial judge conspired with the Attorney General]; *Blodgett v. Superior Court, supra*, 210 Cal. at pp. 6–8, 15–16 [in propria persona plaintiff held in contempt for asserting in pleading that the trial judge acted corruptly in the interest of a party]; *Sears v. Starbird* (1888) 75 Cal. 91, 92 [16 P. 531] [appellant's opening brief contemptuously implied the judge acted "from a love of the parties or their counsel"]; *McCann v. Municipal Court* (1990) 221 Cal.App.3d 527, 538 [270 Cal.Rptr. 640] [attorney's statement to judge, " 'you're not going to convict my client,' " contemptuously implied the court had assumed the role of the prosecutor].)

The language included in the petition at pages 14 and 15 is contemptuous for the following reasons. The claim that, in its opinion affirming White's conviction, "[i]nstead of demonstrating a 'neutral' posture, [this court] bent over backward to come to the aid of a fallen comrade, which is the San Joaquin County District Attorney" directly implies this court acted out of bias toward a party. The assertion that the court "blindly side[d] with the District Attorney" patently makes the unfounded assertion that the court acted out of bias toward a party. The assertion that the court's decision "was not based on logic; it was based on a need to shore up the District Attorney's mistakes," implies both that the court knowingly ignored the law and that it acted out of bias toward a party. And the assertion that the court "ameliorated the effects of the malpractice of the District Attorney at the expense of 'logic' and reputation of the California Courts" implies that the court did not follow the law because of bias toward a party.

---

[19] The California Supreme Court has long held that the inclusion of a contemptuous statement in a document filed in a court is a contempt committed in the immediate presence of the court and thus constitutes a direct contempt. (See, e.g., *In re Ciraolo* (1969) 70 Cal.2d 389, 393 [74 Cal.Rptr. 865, 450 P.2d 241] [contemptuous affidavit]; *Blodgett v. Superior Court* (1930) 210 Cal. 1, 9 [290 P. 293] [contemptuous points and authorities filed in opposition to demurrer]; *Lamberson v. Superior Court* (1907) 151 Cal. 458, 459–460 [91 P. 100] [contemptuous affidavits; court also cites with approval finding of direct contempt in case involving contemptuous petition for rehearing filed in Supreme Court].)

Dangler's defense is premised on (1) his claim that an attorney cannot be held in contempt for language in a written document signed by the attorney and filed in a court if the attorney did not read the document and, thus, did not know the contemptuous language was included in it, and (2) his alleged ignorance of the contemptuous language in the White petition for this reason.

We need not determine whether this is a correct statement of the law or decide whether Dangler's claimed ignorance is credible. Because Dangler has resigned from the State Bar, we will, in the interests of justice, discharge the OSC re contempt.

## SANCTIONS FOR FILING FRIVOLOUS PETITIONS

■ "On a party's or its own motion, a Court of Appeal may impose sanctions, including the award or denial of costs, on a party or an attorney for: [¶] (A) taking a frivolous appeal or appealing solely to cause delay; [¶] (B) including in the record any matter not reasonably material to the appeal's determination; or [¶] (C) committing any other·unreasonable violation of these rules." (Cal. Rules of Court, rule 27(e)(1); further rule references are to the California Rules of Court.) Rule 27(e) is derived without substantive change from former rule 26(e), and now expressly recognizes the court's authority to impose sanctions on its own motion. (Judicial Council of Cal., Advisory Com. com. (2003), reprinted at 23 pt. 1, West's Ann. Codes, Rules (2004 Supp.) foll. rule 27, pp. 138–139.)

■ Because rule 53 makes "[t]hese rules" applicable to original proceedings, former rule 26 (now rule 27) extends to original writ petitions filed in the Court of Appeal. (*Jones v. Superior Court* (1994) 26 Cal. App.4th 92, 96–97 [31 Cal.Rptr.2d 264].) The authority to impose sanctions under rule 27(e) is independent of Code of Civil Procedure section 907. (26 Cal.App.4th at p. 96.)[20]

■ This court may find a writ petition to be frivolous and order sanctions if we conclude the petition was prosecuted for an improper motive or the petition is indisputably without merit, i.e., any reasonable attorney would agree the petition is completely without merit. (*In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 650.)

■ Dangler concedes that sanctions can be imposed against him for filing these three frivolous habeas corpus petitions. We accept his concession, but

---

[20] Authority to impose sanctions in habeas corpus proceedings does not derive from Code of Civil Procedure section 907, which extends, pursuant to Code of Civil Procedure section 1109, only to petitions for writs of mandate, prohibition, or review. (See *Jones v. Superior Court, supra,* 26 Cal.App.4th at p. 96.)

do not do so lightly. Courts must be careful not to deter, for fear of personal liability, an attorney's vigorous assertion of an inmate's rights. (*In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 647.) Thus, sanctions should be imposed sparingly, in only the most egregious case, so as not to discourage use of the Great Writ. And we are mindful it is not easy to obtain a writ of habeas corpus. Particularly when a criminal conviction has been affirmed on appeal, the petitioner faces a steep uphill battle in collaterally attacking that judgment. The petitioner has the burden of stating a prima facie case for relief, and the burden of proving the facts upon which the claim is based. (*In re Bower* (1985) 38 Cal.3d 865, 872 [215 Cal.Rptr. 267, 700 P.2d 1269].) Moreover, a contention may be barred procedurally because it is untimely, repetitive, or raises issues that were, or could have been, raised on direct appeal. (*In re Clark, supra,* 5 Cal.4th at pp. 765, 767; *In re Harris* (1993) 5 Cal.4th 813, 829 [21 Cal.Rptr.2d 373, 855 P.2d 391].) Hence, we do not necessarily equate the failure to obtain habeas corpus relief with frivolousness, or with incompetence of the attorney representing the petitioner.

But here we are presented not just with writ petitions that fail to state a prima facie case for relief or raise contentions that are procedurally barred; we have been required to address petitions that grossly and repeatedly misrepresent both the law and the facts of the cases, causing this court to divert its time and resources from legitimate matters to respond to contentions that no reasonable attorney would have raised.

### 1. *The White Petition is Patently Frivolous*

Having examined at length the petition for writ of habeas corpus submitted by Dangler on behalf of Jackie Don White, we find each of its 25 contentions to be patently frivolous. Because Dangler himself concedes the petition is frivolous, it is not necessary to discuss every contention. We write further simply to highlight a few of the most egregious aspects of the petition.

#### (a) *Frivolous Contentions Regarding Procedural Bars*

Jackie Don White was convicted of murder and other offenses, and was sentenced in May 1993. This court affirmed the judgment on appeal in June 1995, in a published opinion. (*People v. White* (1995) 35 Cal.App.4th 758 [41 Cal.Rptr.2d 510].)

In October 1999, White filed in this court a pro se habeas corpus petition raising 19 separate contentions regarding his conviction, which this court denied in December 1999. (*In re White*, C033987.)

More than 10 years after White's conviction, Dangler filed the instant habeas corpus petition in this court. It is procedurally barred because it is

untimely. The petition also is successive and repetitive, and raises contentions that were, or could have been, raised on direct appeal. The petition is without merit because of these procedural bars. And it is patently frivolous in the manner in which it addresses the procedural bars.

■ A petition for writ of habeas corpus must explain and justify any significant delay in seeking relief. (*In re Clark, supra,* 5 Cal.4th at p. 765 (hereafter *Clark*).) An exception to the rule barring untimely petitions applies where the petitioner shows "error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner." (*Id.* at p. 797.)

The White petition filed by Dangler contends it is not barred as untimely, in part, because it raises claims of ineffective assistance of trial and appellate counsel, which are errors of constitutional magnitude meeting the exception set out in *Clark*.

But in fact, the petition tenders no cognizable claim of ineffective assistance of *appellate* counsel. Although it contains a boilerplate assertion that appellate counsel was ineffective, it leaves ellipses where the arguments regarding ineffectiveness of counsel should have been inserted. We quote the petition in this respect: "[Petitioner] received ineffective assistance of appellate counsel, when his appellate counsel: (a) failed to . . .; (b) failed to raise . . .; and (c) . . . ." Amazingly, the petition omits any references to how appellate counsel purportedly was ineffective—an omission that dooms the claim of error.

And the petition's seven claims of ineffective assistance of *trial* counsel duplicate nearly verbatim the claims that were raised and rejected in the pro se habeas corpus petition filed by White in 1999.[21]

In addition, the petition fails to address why it is not barred given that the vast majority of the contentions raised in the petition either were, or could have been, raised on direct appeal. All of the 15 contentions raised at pages 12 to 78 of the petition are based entirely on matters contained within the appellate record, and thus could have been raised on appeal. And the petition repeats two contentions that *were* rejected on direct appeal, i.e., the claim the evidence of the commission of provocative acts was insufficient, and the claim the trial court erred in admitting evidence that petitioner may have lied

---

[21] The petition additionally states its claims of prosecutorial misconduct and insufficiency of the evidence are not time-barred because they are errors of constitutional magnitude. However, the petition fails to explain why the specific prosecutorial misconduct claims rise to this level. Moreover, claims of insufficiency of the evidence are generally not cognizable on habeas corpus. (See, e.g., *In re Lindley* (1947) 29 Cal.2d 709, 723 [177 P.2d 918].)

at his preliminary examination in asserting he was not present at the scene of the crimes. (See *People v. White, supra,* 35 Cal.App.4th at pp. 765–768, 770–773.)

Any reasonable attorney familiar with the facts and the law would have recognized Dangler's contentions regarding procedural bars are indisputably without merit.

### (b) *Frivolous Contentions Based on Misrepresentations*

The case against White was tried under the "provocative act" murder theory. In its published opinion on appeal, this court pointed out that the felony-murder doctrine does not apply when, as in the case against White, an accomplice is killed by a crime victim. (*People v. White, supra,* 35 Cal.App.4th at pp. 763–765.) And the decision concluded that the case against White was properly tried as a provocative act murder. (*Id.* at pp. 765–770.)

Several contentions in the White petition are premised on the misrepresentation that the trial court erroneously instructed the jury with felony-murder rule instructions. This assertion is patently false. The trial court instructed the jury with CALJIC No. 8.12, the provocative act murder instruction, and did *not* give a felony-murder instruction. No one requested a felony-murder instruction (CALJIC No. 8.21). Indeed, the People argued to the jury only the provocative act theory, that White was responsible for the death of his accomplice, Gray, because one of the victims of the attempted robbery and burglary, Byrd, was reasonably provoked by White's acts into killing Gray. White's provocative acts included using a stun gun on the victims Byrd and Martz, striking Martz in the face near the right eye, and forcing the men onto the floor in a vulnerable position. Finally, this court did not find the trial court committed harmless error in instructing on felony murder; the decision's sole reference to the felony-murder doctrine was the statement that felony murder is not invoked when an accomplice is killed by a victim or peace officer. (*People v. White, supra,* 35 Cal.App.4th at pp. 763–764.)

The White petition contains numerous other misrepresentations of fact and law.

For example, claiming the trial court committed "*Wheeler* error" (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]), the petition premises this contention on the assertion that the court excused from the jury an African-American juror identified as Ms. Dunham. But the appellate record plainly shows that Dunham served on the jury.

In another glaring example, the petition claims the prosecutor was guilty of misconduct for "plant[ing]" Jamie Lee Williams as a witness. But the appellate record shows that no such person was called as a witness.

The petition claims the trial court misinstructed the jury on the provocative act doctrine because the instructions did not explain the difference between an act necessary to perpetrate robbery and a provocative act, and did not indicate that the acts of the deceased accomplice could not be considered as provocative acts. But the appellate record clearly shows the jury instructions *did* explain that the provocative act must be beyond the acts necessary to commit the crime itself, and *did* indicate that the deceased accomplice's acts could not be considered provocative acts.

In another contention concerning the provocative act doctrine, the petition relies on the decision in *People v. Antick* (1975) 15 Cal.3d 79 [123 Cal.Rptr. 475, 539 P.2d 43] for the proposition that the surviving accomplice's provocative acts may not be imputed to the defendant. In fact, *Antick* holds just the opposite. (*Id.* at pp. 88–89.)

And the petition repeatedly asserts that the jury improperly imputed to White the malicious acts committed by his accomplice, Gray, who was shot and killed during the offenses. This contention ignores that the jury was instructed it could not use provocative acts committed solely by Gray as a basis for finding White guilty of murder.

Any reasonable attorney familiar with the facts and the law would have recognized Dangler's contentions based on the aforesaid misrepresentations are indisputably without merit.

### 2. *The Pena Petition is Patently Frivolous*

Dangler concedes that the habeas corpus petition he filed on behalf of Melvin Richard Pena is patently frivolous. Having reviewed the petition at length, we agree. We write further to emphasize the especially egregious nature of this petition.

Pena was convicted of failing to notify authorities of a change of address by a registered sex offender (Pen. Code, § 290, subd. (f)). The trial court found true three prior serious felony convictions under the three strikes law, and sentenced Pena to 25 years to life.

On February 25, 2000, this court affirmed the judgment on appeal, in an unpublished opinion, rejecting Pena's contentions that (1) Penal Code section 290 is unconstitutionally vague as applied to him, given the statute's failure

to define "residence"; and (2) his sentence is cruel and unusual under the state and federal Constitutions. (*People v. Pena* (Feb. 25, 2002, C031169) [nonpub. opn.].)

On May 10, 2000, the California Supreme Court denied Pena's petition for review, which raised the same two contentions rejected by this court (S087139).

On October 10, 2000, the United States Supreme Court denied Pena's petition for writ of certiorari, in which Pena again raised the same two contentions (99-10098).

On March 5, 2004, nearly six years after Pena's conviction, Dangler filed a habeas corpus petition in this court on Pena's behalf. The petition raises the same two contentions this court rejected more than four years ago, and which were denied review by the California Supreme Court and United States Supreme Court.

Even more troubling is that much of the petition's argument asserting that Penal Code section 290 is unconstitutional was copied nearly verbatim from Pena's opening brief on appeal. That brief, filed in Pena's direct appeal in this court, was written by Attorney Christopher Blake, who was appointed to represent Pena on appeal. Thus, for the most part, Dangler simply plagiarized Blake's argument from Pena's prior unsuccessful opening brief on appeal, changing the green cover used for an appellant's opening brief to the red cover used for a writ petition.

The petition's cruel and unusual punishment argument deviates somewhat from the analysis of Pena's appellant's opening brief, in that the petition rests much of its analysis on two Ninth Circuit Court of Appeals decisions that were reversed by the United States Supreme Court *before* Dangler filed the Pena habeas corpus petition in this court. (*Andrade v. Attorney General of State of California* (9th Cir. 2001) 270 F.3d 743 (hereafter *Andrade*), rev. in *Lockyer v. Andrade* (2003) 538 U.S. 63 [155 L.Ed.2d 144, 123 S.Ct. 1166]; *Brown v. Mayle* (9th Cir. 2002) 283 F.3d 1019, vacated and remanded in *Mayle v. Brown* (2003) 538 U.S. 901 [155 L.Ed.2d 220, 123 S.Ct. 1509], and then reversed by the Ninth Circuit in June 2003 in an unpublished opinion (see *Brown v. Mayle* (2003) 66 Fed.Appx. 136).) Thus, it is apparent Dangler was unaware that the authority on which he relied had been overruled.

Any reasonable attorney familiar with the facts and the law would have recognized Dangler's contentions in the Pena petition are indisputably without merit.

### 3. *The Harris-Anderson Petition is Patently Frivolous*

Dangler concedes that the habeas corpus petition he filed on behalf of Renee Harris-Anderson is patently frivolous. Having reviewed the petition at length, we agree.

In February 1999, Harris-Anderson pled no contest to three counts of robbery, admitted several sentencing enhancements, and admitted one prior serious felony conviction charged under the three strikes law, with the understanding that other charges would be dismissed, she would receive a stipulated sentence of 25 years in prison, and she would be allowed to challenge on appeal the trial court's denial of her *"Boykin-Tahl"* motion.[22]

In March 2000, this court decided Harris-Anderson's appeal, held that the *Boykin-Tahl* issue was cognizable on appeal despite her no contest plea, and remanded the matter to the trial court with directions to conduct an evidentiary hearing on her *Boykin-Tahl* motion. (*People v. Harris* (Mar. 8, 2000, C031953) [nonpub. opn.].)

On April 21, 2004, more than five years after Harris-Anderson's conviction, Dangler filed a habeas corpus petition in this court on her behalf.

Among other things, the petition contends Harris-Anderson's trial attorney was ineffective for misadvising her that she could raise the *Boykin-Tahl* issue on appeal. The contention completely overlooks this court's holding that she could raise the issue on appeal, a holding that fatally undermines the premise of Dangler's claim of error.

The petition also asserts that Harris-Anderson's sentence of 25 years in prison is cruel and unusual punishment, in part because it constitutes a sentence of life in prison without parole, and also based upon the Ninth Circuit Court of Appeals' decision in *Andrade* (see discussion, *ante*). This claim of error misrepresents the facts (Harris-Anderson was not sentenced to a life sentence, and she had stipulated to the sentence in order to avoid further punishment on other charges) and misrepresents the law (*Andrade* was reversed by the United States Supreme Court *before* Dangler filed the Harris-Anderson habeas corpus petition in this court). Once again, Dangler demonstrated he was unaware that the authority on which he relied had been overruled.

---

[22] Harris-Anderson had filed a motion in the trial court to set aside the prior conviction allegations because, she alleged, she was convicted without being advised of her rights to a jury trial, to confront witnesses, and to refuse to testify. (*Boykin v. Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].)

The remaining contentions of the petition are that Harris-Anderson's trial attorney failed to advise her of her right to a trial on the prior conviction allegations; her appellate attorney was ineffective for not raising on appeal claims of ineffective assistance of trial counsel; the trial court erroneously denied her motion for new counsel; and the trial court failed to advise her of her right to a hearing regarding her prior convictions. Each of these contentions is belied by the appellate record.

Any reasonable attorney familiar with the facts and the law would have recognized Dangler's contentions in the Harris-Anderson petition are indisputably without merit.

### 4. Dangler's Arguments on Mitigation of the Amount of Sanctions

During the hearing on the OSC's, Dangler argued that the amount of sanctions, which he concedes he should pay, should be mitigated for the following reasons: (1) his poor health; (2) his having made provisions for "writ managers" to supervise the work of his nonattorney staff; (3) his financial inability to pay, particularly given that he has now resigned from the State Bar; (4) letters from members of the State Bar and other citizens who attest to good work he performed in his bankruptcy practice; and (5) his claim that much of this court's time and resources in these proceedings have been spent on the contempt charge, rather than the sanctions charge, because Dangler concedes the three habeas corpus petitions are frivolous.

Although he suffered from serious health problems, Dangler neither argued nor presented evidence that those problems precluded him from understanding his professional and ethical obligations. His health problems provide no excuse for his admittedly signing numerous habeas corpus petitions, including the White petition, without reading them. His health problems provide no excuse for his authorizing a paralegal to sign his name on habeas corpus petitions that Dangler did not read. His health problems provide no excuse for his allowing law students to prepare and file habeas corpus petitions without attorney supervision.

Moreover, the evidence presented by Dangler indicates his debilitating spinal infection had not yet rendered him bedridden at the time he filed the White petition in this court, and he had recovered from the infection long before he filed the Pena petition and the Harris-Anderson petition in this court. Indeed, Dangler presented no evidence as to the circumstances of the preparation and filing of the Pena and Harris-Anderson petitions. Nor did he present evidence that his health problems played a role in the frivolousness of those petitions.

We give no credence to Dangler's contention that the amount of sanctions should be mitigated because he employed writ managers to supervise the

work of law clerks. Evidence shows he employed suspended attorneys, Locke and Wagner, without notifying the State Bar; he did not provide attorney supervision for his law students during extended periods of time; he allowed law students to prepare and file habeas corpus petitions with no attorney supervision; he employed as his writ managers recent admittees to the State Bar who were not sufficiently experienced to provide supervision and who were not even willing to sign the habeas corpus petitions they purportedly supervised; and he either did not require his writ managers to read petitions drafted by law students or did not adequately communicate that requirement to his writ managers.[23]

In any event, it is undisputed that a law student, Livingston, redrafted the White petition for filing in this court, without attorney supervision, and that Dangler signed the petition without reading it. And Dangler presented no evidence that anyone other than he was responsible for the frivolous contentions in the Pena and Harris-Anderson petitions.

In sum, Dangler deserves no credit for being such a deplorable supervisor and disgraceful role model to the law students and the young attorneys he employed.

Dangler has presented no evidence of financial inability to pay monetary sanctions. He testified he had no personal income in 2002, other than a "pension" paid him by Rector, and he received no money from his writ practice in 2003 because his practice was "going in the hole." But he did not introduce any financial records to substantiate his testimony, and he did not present any evidence regarding his financial holdings.

We find that Dangler's testimony about his ability to pay monetary sanctions lacks credibility, in part because evidence presented at the hearing on the OSC's shows that, during the past few years, he has collected $7,250 each from at least 100, perhaps more, habeas corpus petitioners or family members, and that after paying law students or lawyers who actually worked on the petitions, he has kept for himself close to $5,000, less other overhead costs, from each $7,250 retainer.

---

[23] The evidence is overwhelming that Dangler aided nonattorneys in the unauthorized practice of the law, in violation of his ethical obligations under the Rules of Professional Conduct of the State Bar of California, rule 1-300(A). (See also Bus. & Prof. Code, § 6127, subd. (b) [contempt to practice law when not an active member of the State Bar]; Bus. & Prof. Code, § 6126, subd. (a) [misdemeanor to practice law when not an active member of the State Bar]; *Geibel v. State Bar* (1938) 11 Cal.2d 412, 414, 422–424 [79 P.2d 1073] [attorneys aided unauthorized practice of law by signing without reading complaints prepared by unlicensed persons]; *In re Valinoti* (2002) 4 Cal. State Bar Ct. Rptr. 498 [attorney aided nonattorneys in unauthorized practice of law by allowing them to prepare and file immigration applications, pleadings and other documents].)

The letters Dangler provided us from members of the State Bar regarding his conduct and practice in bankruptcy proceedings, and his good moral character, ring hollow in light of the shameful habeas corpus practice that he maintained.

We agree with Dangler that the time the justices and staff of this court have spent in the examination of the contempt charge should not be considered in determining the amount of sanctions. However, the time spent prior to his concession that the petitions are frivolous is relevant to determining the amount of sanctions. And the time spent with respect to the hearing on the OSC's is directly relevant to evaluating Dangler's claim that these frivolous petitions were *sui generis*, in evaluating aspects of his defenses regarding the amount of sanctions, and in understanding the reasons for his filing patently frivolous petitions in this court.

Accordingly, we conclude that $25,000 is a reasonable and responsible monetary sanction to compensate this court in part for the cost of processing, reviewing, and deciding the writ petitions and the orders directing Dangler to show cause why sanctions should not be imposed.

## DISPOSITION

Having found that the petitions for writs of habeas corpus in *In re White*, C045684, *In re Pena*, C046271, and *In re Harris-Anderson*, C046677, fail to state a prima facie case for relief, we deny them without prejudice. We further order that each petitioner may file a new petition for writ of habeas corpus in the superior court, and that the period of time between the date the petitioner retained Dangler and the date upon which this decision becomes final will not be counted against the petitioner with respect to the delay in filing a new habeas corpus petition in the superior court.

Having found that the three petitions for writs of habeas corpus are patently frivolous, in that they indisputably have no merit, we order the attorney for petitioners, Richard H. Dangler, Jr., to (1) within 30 days after this opinion becomes final, refund in full $7,250 to Ralph White—the amount of the retainer for filing habeas corpus petitions on behalf of Jackie Don White—and file with this court written proof, under penalty of perjury, that Dangler has done so, (2) within 30 days after this opinion becomes final, refund in full $7,250 to the person from whom Dangler or his office received the retainer to file habeas corpus petitions on behalf of Melvin Richard Pena, and file with this court written proof, under penalty of perjury, that Dangler has done so, (3) within 30 days after this opinion becomes final, refund in full $7,250 to the person from whom Dangler or his office received the retainer for the habeas corpus petitions for Renee Harris-Anderson, and file with this

court written proof, under penalty of perjury, that Dangler has done so, and (4) within 30 days after this opinion becomes final, pay to this court $25,000 in monetary sanctions to compensate the court in part for the cost of processing, reviewing, and deciding the writ petitions and orders to show cause why sanctions should not be imposed; this payment must be made in full to the court's Clerk/Administrator, unless within 30 days after this opinion becomes final, Dangler and the Clerk/Administrator agree in writing to a specific plan for the payment of this sanction in installments.

The order to show cause re contempt is discharged in the interests of justice.

This opinion constitutes a written statement of our reasons for imposing sanctions. (*Bach v. County of Butte* (1989) 215 Cal.App.3d 294, 313 [263 Cal.Rptr. 565].) Pursuant to the requirements of Business and Professions Code section 6086.7, subdivision (a)(3), a copy of this opinion will be sent to the State Bar of California.