[No. B184017. Second Dist., Div. Six. Nov. 22, 2005.]

In re DEBRA L. KOVEN on Contempt.

**Counsel**

Eric S. Multhaup for Respondent Debra L. Koven.

**Opinion**

**THE COURT.**\*—These contempt proceedings arise from two petitions for rehearing filed by attorney Debra L. Koven (Koven) on behalf of her client, Paul Bashkin (Bashkin). In no uncertain terms Koven accuses us of "deliberate judicial dishonesty." (*In re Buckley* (1973) 10 Cal.3d 237, 250 [110 Cal.Rptr. 121, 514 P.2d 1201].) These accusations are not only false: they are "insolent, offensive, insulting, and [impugn] the integrity of [this] court." (*Ibid.*) After we issued the orders to show cause and apparently after some reflection, Koven now concedes that the accusations "are both improper and inexcusable on their face . . . ." She "apologizes for the improper statements in the petitions, [and] expresses deep regret for impugning the [integrity of this] Court, and accepts the embarrassment she has brought upon herself."

---

\*Before Gilbert, P. J., Yegan, J., and Perren, J.

■ We accept Koven's apology. Nevertheless, we do not purge Koven of the contempts she committed because her unsupported accusations of judicial misconduct are patently outrageous. Moreover, there is an aggravating factor. Koven has engaged in a pattern of abuse. She has also impugned the integrity of the trial judge, opposing counsel, and counsel's expert witnesses. (See *post*, at pp. 274–276.)

The Court of Appeal will not quietly suffer an attack upon its integrity. Our obligation to preserve the integrity of the judiciary compels us to find Koven guilty of two counts of direct criminal contempt of this court. We need not decide whether Koven could be found guilty on more than two counts of contempt because of the multiple contemptuous statements in both petitions. In view of her apology, we do not impose any jail time. It is sufficient to fine her $2,000: $1,000 for each of the two petitions for rehearing. We refer Koven to the State Bar for investigation and, if appropriate, the imposition of disciplinary sanctions. (Bus. & Prof. Code, § 6086.7.)

*Factual and Procedural Background*

Koven represented Bashkin in a legal malpractice action brought against DeWitt F. Blase and Heily & Blase (hereafter defendants). (*Bashkin v. Blase* (Super. Ct. Ventura County, 2001, No. CIV183660).) This action arose from defendants' representation of Bashkin in a combined legal malpractice and medical malpractice action against Bashkin's former attorney (Stephen Marpet) and a psychiatrist (Arthur Sorosky). (*Bashkin v. Sorosky & Marpet* (Los Angeles Super. Ct., L.A. County, 1998, No. LC026201).)

On Bashkin's behalf, Koven filed three appeals. We take judicial notice of the records in these cases. (Evid.Code, § 452, subd. (d).) The first appeal (No. B143004), filed on July 10, 2000, was from the trial court's order denying Bashkin's motion to disqualify defendants' counsel, Musick, Peeler & Garrett. This appeal is hereafter referred to as the "first disqualification appeal." On March 22, 2001, we filed our opinion affirming the trial court's order. (*Bashkin v. Blase* (Mar. 22, 2001, B143004) [nonpub. opn.], opinion by Yegan, J., with Gilbert, P. J., and Perren, J., concurring.)

The second appeal (No. B159344), filed on May 20, 2002, was from the trial court's order denying a new motion by Bashkin to disqualify defendants' counsel and an expert witness (David R. Glickman) retained by counsel. This appeal is hereafter referred to as the "second disqualification appeal."

On December 24, 2002, summary judgment was entered in favor of defendants. The third appeal (No. B168013), filed on June 17, 2003, was from that judgment. This appeal is hereafter referred to as the "summary judgment appeal."

On June 18, 2003, Koven filed a letter requesting that all of the justices of this division (Division Six, Second District Court of Appeal) recuse themselves in the second disqualification appeal. The justices of this division are Gilbert, Yegan, Coffee and Perren. Koven alleged that a reasonable person aware of the facts would "doubt [their] ability to be impartial."

As to Justice Coffee, Koven asserted: "I have just been informed that Justice Coffee, while in private practice, represented [defendants] in an action entitled, *Buckley v. Heily & Blase.* As a result of the representation, Justice Coffee clearly owes a continuing duty of loyalty to [defendants], which would make it difficult for him to be fair to my client . . . ."

Koven alleged that Justices Yegan and Perren were not impartial because they had "sat on the bench of the Ventura County Superior Court during the time that [defendant] DeWitt Blase was actively trying cases in that venue." Koven claimed that a Ventura County Superior Court judge—Barbara A. Lane—had "voluntarily recused herself [in the instant action], ruling *sua sponte*, that all Ventura County Superior Court judges had 'intimate knowledge' of [defendants], and as such, it would be 'very awkward' to have the case remain in Ventura and be heard by judges who knew 'intimately both of the defendants.' " "Given [the judge's] statements," Koven asserted, "[Justices Yegan and Perren] would necessarily be included amongst those who could not be impartial in hearing a matter between [defendants] and [Bashkin]." But Judge Lane did not "rule" that all Ventura County Superior Court judges had intimate knowledge of defendants. She gratuitously said: "There's probably no judge in this courthouse who doesn't know the defendant [DeWitt Blase]." "[T]hat might make this case awkward. He's a character and very well-known in Ventura County."

Furthermore, Koven maintained that the justices of this division were not impartial because they had ruled against Bashkin in previous matters, including his request to stay the trial court proceedings pending the resolution of the second disqualification appeal. Koven alleged: "By failing to grant the stay request, this Division has predetermined its ruling against my client in the instant appeal." Koven accused the justices of Division Six of having "repeatedly denied" her client the "right to equal protection under the law . . . ."

Defendants filed opposition to the request for recusal. Defendants' counsel noted that it had "submitted respondents' brief, which addresses every one of the arguments made in appellant's 47-page opening brief." Defendants' counsel stated: "Spending this kind of time and money on briefing is hardly consistent with knowledge that 'the fix is in' before this Division. As each of you certainly knows, I have no such knowledge."

In an order signed by Presiding Justice Gilbert and filed on July 2, 2003, this court denied the request for recusal "as frivolous."

On July 17, 2003, this court ordered, on its own motion, that the second disqualification appeal "be considered and heard together" with the summary judgment appeal.

On April 22, 2005, Bashkin filed his reply brief in the summary judgment appeal. Oral argument in the second disqualification and summary judgment appeals was heard on May 11, 2005. Because Bashkin's appeals were the last matter on the afternoon calendar and Justice Coffee was not on the panel of justices hearing the appeals, he left the bench before oral argument began.

On May 31, 2005, this court filed its opinions in both appeals. (Nonpublished opinions by Yegan, J., with Gilbert, P. J., and Perren, J., concurring.) We affirmed the trial court's order denying Bashkin's new motion to disqualify defendant's counsel and the expert witness. In addition, we affirmed the summary judgment. Koven filed petitions for rehearing in both appeals. We denied the petitions.

Before denying the petitions for rehearing, we issued two orders, one for each appeal, requiring Koven to show cause why she "should not be adjudged guilty of contempt and punished for impugning the integrity of this court." The order to show cause arising out of the second disqualification appeal was assigned case No. B184017. The order to show cause arising out of the summary judgment appeal was assigned case No. B184018.

The order to show cause arising out of the second disqualification appeal stated that it was "based on the petition for rehearing . . . , including but not limited to the following statements:

"1. 'After reading the Opinion, it became painfully obvious that this Court worked backwards in reviewing the issues to ensure that the "ends justified the means." . . . [¶] It is clear from the Opinion that this Court neither reviewed the controlling cases, nor read [Bashkin's] Reply Brief, which contained the authority mandating reversal. And why would this Court look at cases cited by [Bashkin], anyhow, when it has concealed its own conflicts with defendants resulting from their prior relationships! How could [Bashkin] possibly convince this Court to follow the governing law requiring expert's and counsel's disqualification, when this Court engaged in the same type of "loyalty-breaching" activities that [Bashkin] was complaining about in his motion to disqualify them?! [Bashkin] never stood a chance to succeed on this appeal. If this Court dared to disqualify an expert and a defense firm that failed to disclose conflicts, its own conduct could be called into question! The cards were not only stacked against [Bashkin], but the Jokers were wild!'

"2. 'THE COURT CONSPIRED WITH [DEFENDANTS] TO DEFEAT [BASHKIN'S] INTEREST.'

"3. 'In fact, the justices of this Court refused to disclose their conflicts of interest; refused to respond to [Bashkin's] charges; and refused to recuse themselves, precisely because "the fix <u>was</u> in. . . ."'

"4. 'Despite its obvious "window-dressing," this Court's elaborate "staging" of the removal of Justice Coffee from the panel hearing oral argument on [Bashkin's] two appeals, ironically proved three things: First, that Justice Gilbert knew full well that [Bashkin's] charges against the other three justices were anything but "frivolous." Second, that all of the prior rulings against [Bashkin] in which at least Justice Coffee participated were tainted. And, third, that there were still at least two justices comprising the panel (Yegan and Perren), with personal biases in favor of [defendants], who had failed to respond to [Bashkin's] recusal demands, that were going to perpetuate the "fix." [¶] . . . An independent review of the totality of the circumstances would disclose a "personal bias or prejudice" by the conflicted justices in favor of [defendants] and against [Bashkin] . . . . This Court's rulings against [Bashkin] in this appeal, each of which had <u>no basis whatsoever in fact or law</u>, were merely a reaffirmation that the "fix" was proceeding full bore.'

"5. 'A reasonable person, aware of the facts, would believe that this Court purposely denied [Bashkin's] stay request and purposely delayed the hearing on this interim appeal . . . , since it had already <u>predetermined</u> that it could "kill-two-birds-with-one-stone" by first affirming the summary judgment, and then claiming that its affirmance somehow 'mooted' the Glickman disqualification. This fix was not only "in," but proceeding at full throttle.'

"6. 'This Court's predilection for prejudicial posturing . . . .'

"7. 'THIS COURT MANIPULATED AN AFFIRMANCE . . . .'

"8. 'If this Court had conducted an honest and impartial review of [Bashkin's] willful suppression claim, it would have to have found, as a matter of law, a willful suppression of evidence by MP& G [Musick, Peeler & Garrett] . . . .'

"9. '<u>The bottom line</u>: the record establishes the "presence of judicial partiality" in . . . this Court's review of [Bashkin's] motion.' 'In fact, this Court's finding is a complete red herring. This court purposely concocted a flimsy excuse <u>not</u> to rule on the merits of this issue, because it knew that to do so would have required it to reverse . . . .'"

The order to show cause arising out of the summary judgment appeal stated that it was "based on the petition for rehearing, . . . including but not limited to the following statements:

"1. '[I]t is difficult to remain focused on what is "just" when faced with an unfair and biased Court that predetermined its findings and worked backwards to get there, by deciding the instant appeal before the interim disqualification appeal. In light of their own inherent conflicts of interest pertaining to prior relationships with [defendants]—not to mention, the home-town factor of the "Ventura Good-Old Boy" [defendants]—in combination with the personal animus this Court has toward [Bashkin], even with Clarence Darrow as his representative, [Bashkin] did not stand a chance of prevailing in this Court. The fix was most assuredly "in." '

"2. 'In order to manipulate an affirmance, this Court ignored issues that mandated reversal; refused to apply the law that supported [Bashkin's] position; failed to view the facts and inferences in the light most favorable to [Bashkin], all to his detriment and prejudice, and employed an "end-justify-the-means" approach in order to push this litigant out of the court system.'

"3. '[This court] refused to afford [Bashkin] an opportunity to address these additional grounds upon which his appeal was rejected, because its intent was to deny [Bashkin] his constitutional right to equal protection under the law.'

"4. 'This Court's finding was not simply a flagrant, reprehensible breach of its ethical and legal obligations to afford every litigant, including [Bashkin], equal protection under the law, but it is contrary to all published legal authority in this state. Moreover, it demonstrates a profound lack of integrity, by directly assaulting . . . [Bashkin's] right to have each of his appeals reviewed by a non-prejudicial court that had not enjoyed prior relationships with [defendants] which it kept concealed for the entirety of [Bashkin's] lawsuits involving them!'

"5. 'When this Court chose to engage in a <u>betrayal of the fundamental values and principles of the law,</u> in order to defeat the interests of a "Bashkin," it undertook an "ends-justifies-the-means" approach. The "ends" was to eliminate [Bashkin] from the judicial system, whatever the cost—the cost being this Court's integrity and continuing viability as a depository of the public trust.'

"6. 'Far from viewing the evidence in the light most favorable to [Bashkin], this Court spent two pages of its Opinion trashing [Bashkin] as the "patient-from-hell"[1] who allegedly ordered his doctor to alter his medical records. . . . How convenient for this Court to concoct a trumped-up review of this issue that fits so snugly into its own predetermined perception of this litigant!'

"7. 'THIS COURT MISREPRESENTED THE EVIDENCE IN ORDER TO MANIPULATE AN AFFIRMANCE ON THE SOROSKY FRAUD THEORY OF LIABILITY.'

"8. '[I]f this panel remains steadfast to its unique interpretation of the proper review of unchallenged theories, it must publish its Opinion, so that [Bashkin] will not be singled out for special treatment (which, of course, was this Court's intention from the outset).'

"9. 'The bottom line is: this Court refused to apply the governing principles and law to it[s] analysis of the facts in order to manipulate an affirmance on this issue in favor of a litigant with whom the Court had a personal relationship and against a litigant it views with disdain. . . . Therefore, it must now rehear and reverse the summary judgment on these fraud theories of liability, or be guilty of itself having committed fraud in betraying its duty to uphold the public trust in a fair, impartial judiciary.' "

On September 21, 2005, the California Supreme Court denied Bashkin's petitions for review in the second disqualification and summary judgment appeals. On September 26, 2005, Koven filed a consolidated return to the orders to show cause. Koven apologized for her statements in the petitions for rehearing. On October 14, 2005, we conducted a hearing on the orders to show cause. Koven and her counsel personally appeared at the hearing. Koven's counsel suggested, among other things, that in light of her sincere apology, 15 years of unblemished behavior as a lawyer, and declarations attesting to her professional demeanor, that we should vacate the orders to show cause and not find Koven in contempt.

### Contempt: Impugning the Integrity of the Court

 A direct contempt "is committed in the immediate view and presence of the court, or of the judge at chambers . . . ." (Code Civ. Proc., § 1211, subd. (a).)[2] It may be punished "summarily." (*Ibid.*) "[I]t is the settled law of

---

[1] This court's opinion never referred to Bashkin as the "patient-from-hell."

[2] All further statutory references are to the Code of Civil Procedure unless otherwise stated.

this state that an attorney commits a direct contempt when he impugns the integrity of the court by statements made in open court either orally or in writing. [Citations.] Insolence to the judge in the form of insulting words or conduct in court has traditionally been recognized in the common law as constituting grounds for contempt. [Citation.]" (*In re Buckley, supra*, 10 Cal.3d at p. 248.)

An attorney also commits a direct contempt by impugning the integrity of the court in a document filed with the court. "The California Supreme Court has long held that the inclusion of a contemptuous statement in a document filed in a court is a contempt committed in the immediate presence of the court and thus constitutes a direct contempt. [Citations.]" (*In re White* (2004) 121 Cal.App.4th 1453, 1478, fn. 19 [18 Cal.Rptr.3d 444].) For example, in *Blodgett v. Superior Court* (1930) 210 Cal. 1, 9 [290 P. 293], the California Supreme Court held that the filing of points and authorities containing contemptuous statements constituted a direct contempt. "[T]he fact that the alleged contemptuous statements were contained in pleadings or other papers filed in court does not furnish any excuse or defense against the charge of contempt. It is well settled that contempt may be committed by incorporating impertinent, scandalous, insulting or contemptuous language reflecting on the integrity of the court in pleadings, motions, notice of motions, affidavits, and other papers filed in court. [Citations.]" (*Hume v. Superior Court* (1941) 17 Cal.2d 506, 513–514 [110 P.2d 669].)

■ " 'The judge of a court is well within his rights in protecting his own reputation from groundless attacks upon his judicial integrity and it is his bounden duty to protect the integrity of his court.' [Citation.] 'However willing he may be to forego the private injury, the obligation is upon him by his oath to maintain the respect due to the court over which he presides.' [Citation.]" (*In re Ciraolo* (1969) 70 Cal.2d 389, 394–395 [74 Cal.Rptr. 865, 450 P.2d 241].)

■ Contempt proceedings for impugning a court's integrity are criminal in nature. "Where the primary object of contempt proceedings is to protect the rights of litigants, the proceedings are regarded as civil in character. On the other hand, where the object of the proceedings is to vindicate the dignity or authority of the court, they are regarded as criminal in character even though they arise from, or are ancillary to, a civil action. [Citation.]" (*Morelli v. Superior Court* (1970) 1 Cal.3d 328, 333 [82 Cal.Rptr. 375, 461 P.2d 655].)

■ An act of contempt is punishable by a fine not exceeding $1,000, or by imprisonment not exceeding five days, or by both fine and imprisonment. (§ 1218, subd. (a).)

Koven's statements in the petitions for rehearing are contemptuous on their face. In *In re Buckley, supra,* 10 Cal.3d at p. 250, our Supreme Court concluded that an attorney's statement—" '[t]his Court obviously doesn't want to apply the law' "—was "contemptuous on its face" because it could be fairly taken to mean "that the judge knew the law but deliberately chose to ignore it." In *In re White, supra,* 121 Cal.App.4th at p. 1478, the court found language in a petition for writ of habeas corpus to be contemptuous because it implied "both that the court knowingly ignored the law and that it acted out of bias toward a party." In *Hanson v. Superior Court* (2001) 91 Cal.App.4th 75, 84 [109 Cal.Rptr.2d 782], the court held that counsel's statement "that his client 'has not received a fair trial' was contemptuous on its face because it impugned [the trial judge's] integrity by suggesting he had failed in his duty to guarantee a fair trial."

■ Koven's statements impugning the integrity of this court are far more egregious than the statements in *Buckley, White,* and *Hanson.* She alleges that, because of this court's personal relationship with defendants and bias in their favor, we "fixed" the appeals so that defendants would prevail. The word "fix" means "to influence or arrange the outcome of by unlawful means." (American Heritage Dict. (2d ed. 1982) p. 508, col. 2.) As it relates to the outcome of a lawsuit, the term carries the connotation that for money consideration, a certain result can be purchased from a judge of the court. (See *Willens v. Superior Court* (1971) 19 Cal.App.3d 356, 359 [96 Cal.Rptr. 922].) This is also known as bribery. (See Pen. Code § 92, et seq.) Koven accuses us of ignoring the law and misrepresenting the evidence "[i]n order to manipulate an affirmance." According to Koven, "in order to defeat the interests of a 'Bashkin', [we] undertook an 'ends-justifies the means' approach. The 'ends' was to eliminate [Bashkin] from the judicial system, whatever the cost—the cost being this Court's integrity and continuing viability as a depository of the public trust." Justice Coffee's departure from the bench before oral argument was " 'window-dressing' " and an "elaborate 'staging' " perpetrated by this court. We "refused to disclose [our] conflicts of interest; refused to respond to [Bashkin's] charges; and refused to recuse [ourselves], precisely because 'the fix <u>was</u> in'. . . ." Our rulings "were merely a reaffirmation that the 'fix' was proceeding full bore." "The cards were not only stacked against [Bashkin], but the Jokers were wild!" We "purposely concocted a flimsy excuse <u>not</u> to rule on the merits of [an] issue, because [we] knew that to do so would have required [us] to reverse . . . ." Our "intent was to deny [Bashkin] his constitutional right to equal protection under the law." We "concoct[ed] a trumped-up review of [an] issue that fits so snugly into [our] own predetermined perception of [Bashkin]!" The "fix was not only 'in,' but proceeding at full throttle."

Koven claims that this court and defendants "conspired" together to defeat Bashkin's appeals. "A conspiracy is an agreement entered into between two

or more persons with the specific intent to agree to commit the crime of _____ and with the further specific intent to commit that crime, followed by an overt act . . . ." (CALJIC No. 6.10.) She argued that if we did not grant a rehearing and reverse the summary judgment, we would be "guilty of . . . having committed fraud in betraying [our] duty to uphold the public trust in a fair, impartial judiciary."

Koven's statements impugning the integrity of this court are devoid of any factual support. Her request to recuse Justice Coffee was frivolous. The basis for her request was that she had "just been informed that . . . , while in private practice, [he had] represented [defendants] in an action entitled, *Buckley v. Heily & Blase.*" Other than the case title, Koven provided no information about the prior matter. She did not say when or where the *Buckley* action had been filed, nor did she describe the issues in that action. She did not even give the action's case number. Koven presented no evidence to support her concern that Justice Coffee would not be impartial.

██ Koven's mere recitation of the case title was insufficient to require Justice Coffee to recuse himself even if he had represented the defendants in the prior matter. Recusal would have been required if the prior matter had "related to the same contested issues of fact and law as the present matter," or if he had represented the defendants within the previous two years. (Cal. Code Jud. Ethics, canon 3E(5)(a) & (b).) Justice Coffee's representation of defendants could not have occurred within two years of Koven's request for recusal. Pursuant to Evidence Code section 452, subdivision (h), we take judicial notice that Justice Coffee has continuously served as a member of the judiciary since January 1992. In any event, Justice Coffee was not on any of the panels that heard Bashkin's three appeals. The panels consisted of Justices Gilbert, Yegan, and Perren. The denial of the request to recuse Justice Coffee, therefore, could not have prejudiced Bashkin.

As to Justices Yegan and Perren, Koven's sole basis for alleging the existence of a personal relationship with defendants is that these justices were on the Ventura County Superior Court when DeWitt Blase was practicing law before that court. It is illogical to assume that an attorney who regularly practices before a court develops personal ties with all of the judges assigned to that court. Koven has presented no evidence supporting the existence of any relationship, personal or otherwise, between these justices and Blase. Thus, her request to recuse Justices Yegan and Perren was also frivolous.

If Koven truly believed that Justices Yegan and Perren were biased against her client because of a personal relationship with defendants, she should have requested that they recuse themselves before she lost the first disqualification appeal. In her letter seeking recusal filed on June 18, 2003, Koven relied on

Judge Lane's gratutious comments concerning knowledge of DeWitt Blase by Ventura County judges. But Judge Lane's comments were made in Koven's presence on August 19, 1999, approximately 11 months before Koven filed the notice of appeal in the first disqualification appeal. Koven never explained why, despite her knowledge of Judge Lane's comments, she waited until the second disqualification appeal to seek the recusal of Justices Yegan and Perren.

"[W]e can conceive of only one purpose, i.e., 'judge-shopping,' for [Koven's] attempt . . . to cause this court to recuse itself . . . ." (*First Western Development Corp. v. Superior Court* (1989) 212 Cal.App.3d 860, 867 [261 Cal.Rptr. 116].) Koven lost the first disqualification appeal, and the second disqualification appeal involved similar issues. Koven must have concluded that she would fare better before a different division.

Accordingly, Koven is in direct contempt of this court. (See *In re White, supra,* 121 Cal.App.4th at p. 1478, fn. 19.)

### *Koven's Apology*

■ "[I]n instances of direct contempt an apology to the judge should be given serious consideration. [Citation.]" (*In re Buckley, supra,* 10 Cal.3d at p. 257.) We have given serious consideration to Koven's apology but, for the following reasons, we conclude that it is insufficient to purge her of the contempts she has committed:

1. Koven is an experienced attorney. She has been practicing law in California for 15 years.

2. Koven's charges are not only false, they are outrageous. We can think of no accusation more serious or injurious to a court's reputation than that it "conspired" with a party to "fix" the case.

3. The lack of any support whatsoever for Koven's charges, together with the timing of the charges, compels the conclusion that she was not acting in good faith. Koven waited to make her allegations of bias and misconduct until after she had lost the first disqualification appeal and after Blase died in 2002.[3] Whether or not she knew of his death when we decided the second and third appeals, it is inconceivable that this court, or any court, would engage in judicial dishonesty out of loyalty to a dead man. Since Blase had

---

[3] Pursuant to Evidence Code section 452, subdivision (h), we take judicial notice that Blase died on May 29, 2002. A death notice for Blase was published on page B7 of the June 1, 2002 edition of the Ventura County Star.

been dead for three years when this court decided the second disqualification and summary judgment appeals, it was legally impossible for us to have "conspired" with him to defeat these appeals.

4. The tone of Koven's petitions for rehearing is spiteful and malicious. Our impression is that she was more concerned with venting her anger upon this court than advancing the interests of her client.

5. Koven's contemptuous statements were not blurted out inadvertently in the heat of a courtroom battle. They were deliberately made in petitions for rehearing after consideration of the issues. Her thinking capacity was not impaired by any physical or psychological problem. In her return to the order to show cause, Koven declared: "I have no issues as far as medical problems, substance abuse, prescription drug usage, or other physiological or psychological factor that contributed to my lapse of judgment."

6. This is not the first time in this litigation that Koven has impugned a court's integrity. Koven is a repeat offender. In her opening brief in the second disqualification appeal, Koven impugned the integrity of the trial judge, Kent M. Kellegrew. In the trial court, Koven had filed a written verified statement challenging Judge Kellegrew's impartiality after he had denied Bashkin's motion to disqualify opposing counsel and counsel's expert witness. (§ 170.3, subd. (c)(1).) In denying the motion, Judge Kellegrew found that Bashkin was "engaging in gamesmanship."[4] The issue of Judge Kellegrew's disqualification was heard and determined by Judge David T. McEachen of the Orange County Superior Court. Judge McEachen concluded that Judge Kellegrew was not disqualified. He found "that no reasonable person aware of the facts in this case would entertain a doubt as to Judge Kellegrew's ability to be impartial."

In her opening brief in the second disqualification appeal, Koven alleged that Judge Kellegrew had "escape[d] disqualification through his willful misconduct." She accused him of attempting "to cover up [his] malfeasance by proffering . . . [a] fraudulent excuse," of refusing to apply the law, and of "manufactur[ing] new law designed to defeat the interests of 'a Mr. Bashkin,' in order to punish him for having exposed the judge's own appearance of

---

[4] " '[A]s courts are increasingly aware, motions to disqualify counsel often pose the very threat to the integrity of the judicial process that they purport to prevent. [Citation.] Such motions can be misused to harass opposing counsel [citation], to delay the litigation [citation], or to intimidate an adversary into accepting settlement on terms that would not otherwise be acceptable. [Citations.] In short, it is widely understood by judges that "attorneys now commonly use disqualification motions for purely strategic purposes . . . ." [Citations.]' [Citation.]" (*Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1339–1340 [104 Cal.Rptr.2d 116].)

impropriety." "As a result of [Baskin's] embarrassing revelations of the judge's appearance of impropriety, Judge Kellegrew shot the messenger, stripping [Bashkin] of his constitutional right to due process and equal protection, while becoming an advocate for the defense." Koven alleged that Judge Kellegrew had deliberately made Bashkin "the exception to the rules governing disqualification . . . ." Judge Kellegrew's "despicable conduct" and "contemptible" ruling had resulted from his "personal prejudices and abject refusal to apply controlling and dispositive authority . . . ." Koven claimed that Judge Kellegrew had "ignored . . . evidence since he had already predetermined that [Bashkin] should be treated as the 'exception that proves the rule,' since these rules never 'contemplated a Mr. Bashkin.' " "Judge Kellegrew predetermined his findings against [Bashkin] and then manipulated the facts to support them." Furthermore, Koven maintained that "outrageous comments" by Judge Kellegrew had "established [his] desire to treat [Bashkin] differently than all other litigants and to deprive him of his constitutional guaranty to equal protection under the law." Finally, Koven alleged that Judge Kellegrew had submitted a "fraudulent" response to her written verified statement challenging his impartiality. Koven asserted that "Judge Kellegrew's deceit [had] deprived Judge McEachen 'of the opportunity to exercise his informed discretion.' "

■ 7. In her briefs in the second disqualification appeal, Koven also impugned the integrity of opposing counsel and of counsel's expert witnesses. She accused counsel of having perpetrated "a fraud on the public trust" by hiring "two conflicted experts" and of having "destroyed the public trust in the integrity of the bar." Koven also accused counsel of committing "fraud on the court regarding its willful suppression of evidence" and of engaging in "purposeful misconduct" to "manipulate[] the outcome of the case . . . ." Koven asserted that counsel had "admitted to willfully suppressing evidence and fraudulently deceiving both [Bashkin] and the trial court in order to prevent [Bashkin] from prevailing on the Motion [to disqualify counsel and counsel's expert witness]." Counsel's alleged misconduct had resulted in the "corruption of the judicial process." In addition, Koven claimed that counsel had committed perjury and had "suborned its experts' perjury regarding their conflicts-check systems, in order to escape disqualification." Perjury and subornation of perjury are felony offenses. (Pen. Code, §§ 118, 126, 127.)

It appears to us that Koven's approach to litigation in the Bashkin case focused upon impugning the integrity of everyone in the legal system, whether judges, justices, attorneys, or expert witnesses, who obstruct the achievement of her goals. This shows a pattern of abuse which serves to aggravate the contempts committed here.

## *Disposition*

We find Debra L. Koven guilty of two counts of direct criminal contempt of this court: one count for each petition for rehearing. She is ordered to pay a total fine of $2,000: $1,000 for each count of contempt, payable in the clerk's office of this court within 60 days after this decision becomes final for all purposes. Pursuant to Business and Professions Code section 6086.7, the clerk of this court is directed to forward to the State Bar a copy of this judgment of contempt. Upon the finality of judgment the clerk shall issue the remittiturs in case numbers B159344 and B168013.

A petition for a rehearing was denied December 14, 2005, and the opinion was modified to read as printed above.