Filed 10/7/22 Marriage of Best CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of TEDDE and WILLIAM BEST. | |
| TEDDE LOWRY BEST, Respondent, v. WILLIAM BEST, Appellant. | G060508 (consol. with G060770) (Super. Ct. No. 18D001763) O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Barry S. Michaelson, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Affirmed.

Sullivan Law & Associates and Christine Ulich for Appellant.

Law Offices of Patrick A. McCall and Patrick A. McCall for Respondent.

\*      \*      \*

William Best (William) appeals from a postjudgment order that reduced his permanent spousal support payments to Tedde Lowry Best (Tedde), awarded her $7,500 in need-based attorney fees (Family Code, § 2030 et seq.),[1] and denied his request for attorney fees as a sanction (§ 271).

In 2019, after a marriage lasting more than 25 years, William and Tedde divorced. Pursuant to the judgment of dissolution, William was to pay Tedde $5,800 in monthly spousal support. About 16 months later, William sought modification of his spousal support obligation after losing his job as the vice president of product development for a sporting goods company in California, where his annual salary was $235,000. William, a former member of the U.S. Ski Team, moved to Steamboat Springs, Colorado, because he believed there were job opportunities for him there. But the only position he could obtain was that of guest service "ambassador" for the ski resort, which paid $12.50 an hour. Based on his changed circumstance, William requested his spousal support payment be reduced to zero. William's spousal support payments were Tedde's only source of income.

At the modification hearing, the court received vocational evaluations of William and Tedde prepared by an expert. The court found William had an earning capacity of at least $90,000 a year and Tedde had the ability to earn $12 an hour (the court made no finding as to how many hours a week Tedde could work). After considering the section 4320 factors, the court ordered William's monthly spousal support payment reduced from $5,810 to $4,500, but the court denied William's request for a retroactive order.

William raises multiple challenges to the spousal support modification order. He contends: (1) the court improperly used a Dissomaster to calculate the amount; (2) when determining his ability to pay, the court misapplied the law by

---

[1]     Subsequent statutory references are to the Family Code unless otherwise stated.

imputing an earning capacity of at least $90,000 annually; (3) the court misapplied the law by forcing him to relocate; (4) the court failed to consider all section 4320 factors; and (5) the court erred by ordering him to pay $4,500 in spousal support given the parties' financial circumstances. William also contends the court abused its discretion by denying his request to make the modification retroactive, awarding need-based attorney fees to Tedde, and denying his request for attorney fees as a sanction. Finding no error, we affirm.

FACTS

I. *Judgment of Dissolution*

After more than 25 years of marriage, the parties divorced, and a judgment of dissolution was filed in August 2019. Pursuant to the stipulated dissolution judgment, William was to pay permanent spousal support to Tedde in the amount of $5,810 per month until she remarried, either party died, or further court order. The stipulated judgment stated the parties had considered the factors in section 4320 in reaching an agreement on spousal support. As relevant here, the stipulated judgment stated: "The parties agree that shortly after marriage in 1992, [Tedde] stopped working outside the home in order to take care of the minor children and household. [Tedde] has no college education, nor any other vocational or other professional training or licenses. She currently assists both of her elderly parents ages 89, 90 respectively, who are in poor health, 3 or 4 days a week but is not being paid for her assistance due to their lack of finances to pay for daily required assistance. The parties agree that [William] has been the sole financial supporter of the family. At the time of separation, he was making approximately $235,000 a year as the Vice President of Product Development, for United Sports Brands. He has a Bachelor of Science degree, but no other professional or vocational licenses." At the time of the dissolution judgment, Tedde was 62 years old, William was 59 years old, and their two children were in their 20's.

3

The stipulated judgment equally divided the marital community property, which included bank accounts, a pension trust, a 401(k), and individual retirement accounts (IRA's). Based on the valuations at the time of the stipulated judgment, each party received about $410,500. Tedde also received a separate payment of $20,000 from William's checking account. William received an additional $248,000 from a bank account as reimbursement for his separate property contribution to the purchase of the marital residence. The stipulated judgment confirmed as William's separate property $880,000 that he had inherited from his parents. Contained within the stipulated judgment was a provision stating the parties' agreement that before either party filed a request for modification of spousal support, they would participate in a settlement conference or informal meditation.

## II. *William Loses His Job*

In November 2019, a few months after the judgment of dissolution was filed, William lost his job due to a company reorganization. He was provided severance pay for a year. The details of his severance package, i.e., the amount he received or how it was distributed, were not provided below.[2]

After losing his job, William searched for a comparable position through his networking connections and "headhunters." He interviewed with various companies but did not receive a job offer.[3]

In October 2020, William moved to Steamboat Springs, Colorado. He picked this location for two reasons. One was a potential job opportunity with a startup company called Northland Skis. The second was a large expansion project by the

---

[2]    The record does indicate William had a lawsuit against his former employer concerning his severance package.

[3]    William's job search was unfortunately taking place during the beginning of the COVID-19 pandemic.

4

Steamboat resort, which he believed would result in job opportunities. He focused on these opportunities because his professional career began in the ski industry and he had networking connections in the industry. William was hired as a guest services ambassador in November 2020, the same month his severance payments ended. He earned $12.50 an hour and worked 30 to 40 hours a week.

William hired counsel in Colorado to negotiate a modification of his spousal support. His attorney sent communications to Tedde in mid-September and mid-October 2020 to schedule a mediation but did not receive a response.

III. *Request for Modification Order*

Approximately 16 months after the dissolution judgment was filed, William filed a request for modification of spousal support, seeking to reduce his spousal support payment to zero based on his changed circumstances. He filed an Income and Expense Declaration (I&E) in December 2020, reflecting his hourly salary as an ambassador at the ski resort. He listed an investment account that provided $1,412 in monthly income and a one-time payment of $3,245 from his inherited IRA account. He indicated his assets, including cash, bank accounts, stocks, bonds, and other assets he could sell were "TBD" (to be determined). He declared his average monthly expenses were nearly $16,500, which included his spousal support payment to Tedde ($5,810).

Tedde opposed William's request to modify spousal support. Since entry of the judgment of dissolution, Tedde had not sought employment as she was caring for her elderly parents. She requested William's imputed income to be in an amount no less than $225,000 per year for the purpose of calculating support.

The parties stipulated to a vocational evaluation conducted by David Laine to determine each person's current and future employability and earning capacity.

Both parties filed I&E's in March 2021. William's showed his average monthly wage was $1,403, and he received $1,412 in monthly income from an

investment account. He stated his average monthly expenses were $19,035, which included his $5,810 spousal support obligation to Tedde. His largest monthly expenses were two credit card bills totaling nearly $7,000, and he indicated he used these credit cards to pay some of his listed monthly expenses. He did not provide the current balances of his assets; instead, he cited to the section in the stipulated judgment of dissolution concerning the division of the community property.

Tedde's I&E showed her only income was the spousal support she received from William. She declared her assets included $3,800 in banking accounts and $2,000 in personal property. She did not have any stocks, bonds, or assets she could easily sell. Her monthly expenses totaled nearly $5,500.

IV. *Hearing*

Over two days in April 2021, the court received evidence concerning William's request to modify his spousal support, including the vocational expert's reports and testimony. Laine opined William's best earning capacity would be to seek new employment comparable to his past employment; Laine called this "Option I." Under this option, Laine believed William had the ability to earn $185,000 to $225,000 a year. Laine explained the job market at the time of the hearing was a lot better than it was the year prior and national statistics suggested William should be able to find new employment within seven months. Laine, however, indicated William had reached senior levels in his work history and it might be difficult for him to secure employment at that level. Laine did not find job openings for comparable positions in Steamboat Springs, other than what William had been cultivating.

Laine opined "at the very least" William should be able to secure a midlevel management position while he sought employment at a senior level comparable to his prior employment; Laine called this "Option II." With such a position, William would be able to earn from $70,000 to $110,000 a year. Laine obtained this salary range

6

by looking at the national average salary for store managers of Dick's Sporting Goods, which he described as "one of the most prominent sporting goods companies" in the country. Laine believed William would be a "strong candidate" for such a position, and he recommended William seek out a midlevel management position until he obtained a senior level position.

Laine believed William had conducted a diligent and aggressive job search. In Laine's opinion, if William continued to use his best efforts to secure employment, he should be able to secure a higher paying job in the near future.

At the time of the hearing, Tedde was living in Delaware. Her parents lived in Maryland, so four days a week, she drove nearly two hours each way to care for them. She reported to Laine she was being treated for anxiety and depression and recovering from a shoulder injury. She was not looking for employment and wanted to remain focused on caring for her parents. Given her limited work experience and skills, Laine opined Tedde's best earning capacity was to obtain employment in customer relations or a related field, which paid $12 to $15 an hour. He recommended she pursue computer training to improve her skills. In looking at potential occupations for Tedde, Laine did not consider senior caretaker because it was unlikely she would be able to physically perform the work.

William testified that he planned to stay in Steamboat Springs after the ski season ended in April, and when the resort reopened in June, he would resume his ambassador position. However, he would have no income between the ski and summer seasons. William was continuing his search for a higher paying job, and believed there were opportunities either with the resort or a startup company. William did not believe the job opportunities discussed in the vocational expert's report applied to him because he was not qualified for the positions or they were not in Steamboat Springs and he was unwilling to relocate.

V. *Attorney Fees Motions*

Tedde filed a motion for need-based attorney fees (§ 2030), requesting fees in the amount of $18,388. William opposed the request and filed a request for $5,000 in attorney fees as a sanction (§ 271) based on Tedde's failure to meet and confer before he filed his modification request.

VI. *Court's Rulings*

In May 2021, the court issued its six page tentative decision, which became its final statement of decision. Based on the vocational evidence presented, the court concluded William was able to earn at least $90,000 annually ($7,500 a month). The court evaluated the section 4320 factors and found a substantial change of circumstances warranting a reduction of William's spousal support to $4,500 a month. The court granted, in part, Tedde's request for attorney fees, awarding her $7,500.

At the hearing on the court's tentative decision, William requested the court explain the basis for its determination of the amount awarded in spousal support. The court explained it found that amount necessary for Tedde's support, William was able to pay that amount, and it was an appropriate amount for him to pay. The court initially stated it did not impute a specific amount of income to Tedde but later indicated it found Tedde had the ability to earn $12 an hour and considered that in its determination of the amount of spousal support. The court orally denied William's request for attorney fees. William did not file written objections to the court's decision.

William first appealed from the court's unsigned minute order of the hearing on the tentative decision (appellate case no. G060508). This appeal was premature. (*Smith v. Smith* (2012) 208 Cal.App.4th 1074, 1091 ["'where a formal order is required, a minute order is not appealable'"].) William filed a second appeal following the filing of the findings and order after hearing (appellate case no. G060770). We granted his motion to consolidate the two appeals.

8

## DISCUSSION

### I. *Dissomaster*

In his opening brief, William's first legal argument starts with a bang. He asserts the court's order must be reversed because the court improperly used a Dissomaster to calculate the reduced spousal support award. To support his assertion, he attaches a copy of a Dissomaster report he prepared for the purpose of his appeal.

We find this argument outrageous for two reasons. First, William's Dissomaster report was neither an exhibit in the proceedings below nor part of the appellate record. It was never presented to the trial court. Thus, attaching it to an appellate brief is improper and violates the rules of appellate procedure. (Cal. Rules of Court, rule 8.204(d).) Counsel should know better, and we will not consider the Dissomaster attachment. (*Hodge v. Kirkpatrick Development, Inc.* (2005) 130 Cal.App.4th 540, 546, fn. 1 [declining to consider document attached to brief because it was not part of appellate record and its attachment violated rules of court].)

Second and of greater concern is that William's assertion is directly refuted by the record. Following the issuance of its tentative decision, the court explicitly stated it did not use a computer program in determining the reduced spousal support amount because it was not permitted to do so when setting permanent spousal support. (See *In re Marriage of Zywiciel* (2000) 83 Cal.App.4th 1078, 1081-1083.) William acknowledges the court denied using a computer program. Nevertheless, William asserts the court used the Dissomaster program, when calculating the reduced spousal support amount. William's argument impugns the honesty and integrity of the trial court. William has nothing to support the allegation, other than his speculation, so we outright reject this argument. We recognize counsel has a duty of zealous advocacy, but counsel must be careful not to cross the line and make a contemptuous statement "of deliberate judicial dishonesty." (*In re Buckley* (1973) 10 Cal.3d 237, 250; see *In re Koven* (2005)

9

134 Cal.App.4th 262, 264-265 [attorney sanctioned for impugning the integrity of the judiciary].)

II. *Spousal Support Modification Order*

William makes several attacks on the court's order reducing his monthly spousal support payment to $4,500. None of them are persuasive. We begin with his argument the court erred by using his earning capacity rather than his actual earnings in determining his ability to pay spousal support.

A. *General Principles Concerning Spousal Support Modifications*

"To modify spousal support, a trial court must first find ""'a material change of circumstances since the last order.""" [Citations.]" (*In re Marriage of T.C. & D.C.* (2018) 30 Cal.App.5th 419, 424.) The spouse seeking to modify the spousal support order bears the burden of establishing a material change in circumstances. (*In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 956-957 (*Minkin*).) "'Change of circumstances means a reduction or increase in the supporting spouse's ability to pay and/or an increase or decrease in the supported spouse's needs. [Citations.] It includes all factors affecting need and the ability to pay.' [Citation.] 'A trial court considering whether to modify a spousal support order considers the same criteria set forth in Family Code section 4320 as it considered in making the initial order.' [Citation.]" (*In re Marriage of Dietz* (2009) 176 Cal.App.4th 387, 396.)

Section 4320 lists 14 circumstances for the court to consider in ordering spousal support. "The court has discretion as to the weight it gives to each factor [citation], and then "'the ultimate decision as to amount and duration of spousal support rests within its broad discretion . . . ." [Citation.]' [Citation.] Failure to weigh the factors is an abuse of discretion." (*In re Marriage of Shimkus* (2016) 244 Cal.App.4th 1262, 1273.)

10

"We review a trial court decision on a request to modify spousal support for an abuse of discretion. "'"So long as the court exercised its discretion along legal lines, its decision will not be reversed on appeal if there is substantial evidence to support it."'" [Citation.]" (*Minkin, supra*, 11 Cal.App.5th at p. 957.) "'[W]e do not substitute our own judgment for that of the trial court, but determine only if any judge reasonably could have made such an order.'" (*In re Marriage of Berger* (2009) 170 Cal.App.4th 1070, 1079.) "We presume the court's decision is correct and the appealing party must affirmatively show error." (*Minkin, supra*, 11 Cal.App.5th at p. 957.)

B. *William's Earning Capacity*

William contends the court misapplied the law by using his earning capacity instead of his actual earnings in determining the spousal support award. We disagree.

Earning capacity is pertinent to two factors in section 4320. First, the court must consider "[t]he extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage . . . ." (§ 4320, subd. (a).) Second, the court must consider "[t]he ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living." (*Id.*, subd. (c).) Case law has established earning capacity incorporates three factors: (1) ability to work; (2) willingness to work; and (3) opportunity to work. (See *In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 927-928.) Where "ability and opportunity, are present, earning capacity may properly be imputed even where the party lacks willingness to find more lucrative work. [Citation.]" (*Id.* at p. 929, fn. 3.) But "[u]se of the earning capacity standard is inappropriate where a party lacks either the ability *or* the opportunity to work. [Citations.]" (*Id.* at p. 928.)

Evaluating whether each party's earning capacity was sufficient to maintain the marital standard of living (§ 4320, subd. (a)), the court found Tedde "has minimal

earning capacity" but William "has far greater earning ability as shown by his past earnings." In considering William's ability to pay spousal support (*id.*, subd. (c)), the court found William "has the ability to earn substantial sums. He has chosen to restrict himself to a specific geographical area and sport. While this is appropriate for him to do, he still has the legal responsibility to support [Tedde] and she is not required to be part of his investment or other endeavors." Based on the evidence before it, the court concluded William's earning capacity was at a minimum $90,000 a year ($7,500 a month).

William contends the court erred in determining his earning capacity. He acknowledges substantial evidence for his ability and willingness to work, but not for the court's implied finding he had the opportunity to work. "'[O]pportunity to work' is the substantial likelihood that a party could, with reasonable effort, apply his or her education, skills and training to produce income." (*In re Marriage of Cohn, supra*, 65 Cal.App.4th at p. 930.) Applying this definition, we conclude there is substantial evidence of William's opportunity to work.

The trial court considered the vocational expert's report and testimony concerning William's potential work opportunities and salaries, as well as William's testimony. The expert had performed national labor market research, concentrating on fitness, ski, and sporting goods industries, areas within William's expertise. The expert had identified six job opportunities nationwide for positions that were comparable to William's prior employment, Option I jobs. The expert used a nationwide search because he was under the impression William was willing to relocate for such a job. William, however, testified he was not willing to move and that he lacked qualifications or experience needed for the positions identified by the expert. As for the midlevel management positions the expert identified as Option II jobs, William also attempted to counter the expert's testimony concerning these job opportunities. William testified he was not qualified to be a store manager for Dick's Sporting Goods because he lacked

12

retail and managerial experience and there was not a Dick's Sporting Goods store in Steamboat Springs.

William asserts the court erred in finding he had an opportunity to work because there was no evidence of career opportunities under Option I or Option II in Steamboat Springs. We disagree. The evidence supported the court's conclusion that William had the opportunity to work — that he "could, with reasonable effort, apply his . . . education, skills and training to produce" an imputed income of at least $90,000. (*In re Marriage of Cohn, supra*, 65 Cal.App.4th at p. 930.) There was evidence of Option I job opportunities available to William in locations throughout the country, as identified by the vocational expert. However, William, who had just moved to Steamboat Springs was unwilling to relocate for these jobs. It is well established earning capacity may be imputed when a party demonstrates an unwillingness to earn and pay support. (*Id.* at p. 929, fn. 3 ["a party cannot circumvent the 'willingness' element by deliberately refusing to find employment consistent with his or her earning ability"].)

Notwithstanding William's unwillingness to move for an Option I job with pay comparable to his prior position, there was evidence William was cultivating opportunities for upper management positions in Steamboat Springs. William testified there were management opportunities with the resort. He planned to pursue these opportunities and believed the resort's expansion would bring more even opportunities. William was also pursuing a position with a startup company. They remained interested in him and he hoped to obtain a significant, paying position with them.

Concerning William's opportunity to obtain a midlevel management position, the Option II jobs, the court received evidence from the vocational expert that the national average base salary for a manager at a sporting goods store was approximately $90,000. The trial court credited the expert's testimony that *at a minimum* William would be able to obtain a midlevel job earning $90,000.

As there was evidence William had the ability and opportunity to work, the court did not abuse its discretion by considering William's earning capacity rather than his actual earnings. (*In re Marriage of Cohn, supra*, 65 Cal.App.4th at pp. 927, 930-931.)

William claims the court should have used his actual earnings rather than earning capacity when determining spousal support because there was no evidence of an intention to avoid his support obligation. He is mistaken. A "trial court's consideration of earning capacity is not limited to cases in which a deliberate attempt to avoid support responsibilities is found." (*In re Marriage of Ilas* (1993) 12 Cal.App.4th 1630, 1638-1639.) Instead, a trial court enjoys broad discretion in determining whether to use actual earnings or earning capacity when considering spousal support. (*In re Marriage of Simpson* (1992) 4 Cal.4th 225, 233; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2022) [¶] 6.858, pp. 6-467 to 6-468.) The statutory guidelines governing the determination of spousal support "do not specify or limit the circumstances under which the trial court may look to earning capacity in addition to, or in place of, actual income in fixing support." (*In re Marriage of Simpson, supra*, 4 Cal.4th at p. 232.) Generally, spousal support orders are based on the parties' actual incomes because those amounts usually reflect their earning capacity. "However, [section] 4320 specifically permits consideration of the supporting spouse's *ability to earn* (earning capacity) in *all cases*," not just those in which there is a deliberate attempt to avoid financial responsibility. (Hogoboom & King, *supra*, [¶] 6.858, pp. 6-467 to 6-468.) Here, we conclude the court's decision to consider William's earning capacity did not constitute an abuse of discretion.

C. *The Court Did Not Force William to Move*

William contends the court misapplied the law and violated his federal constitutional rights by forcing him to move. The trial court, however, made no such

order. In fact, the court said the opposite. In its statement of decision, the court noted William had chosen "a specific geographic area and sport" and that this was "appropriate for him to do." While the court held William to his "legal responsibility" to provide support for Tedde, the court did not order William to relocate.

D. *The Court's Consideration of the Section 4320 Factors*

Finally, William argues the modification order must be reversed because the court failed to consider three section 4320 factors. William asserts the court did not consider: each party's assets (§ 4320, subd. (e)), Tedde's ability to be gainfully employed (*id.*, subd. (g)), and the support Tedde provides to her parents (*id.*, subd. (n)). We disagree. The court addressed all of the section 4320 factors in its statement of decision.

1. *The Court Considered Section 4320, Subdivision (e)*

Section 4320, subdivision (e), mandates when ordering spousal support, the court consider "[t]he obligations and assets, including the separate property, of each party." William contends the court failed to consider the value of the community property assets Tedde received in the divorce and that she could produce income from these assets. We disagree.

At the time of the divorce, each party received about $410,500 from the community property assets, which included IRA's, pensions, and bank accounts. William testified at the modification hearing, less than two years later, that the current value of each party's community property assets was now $700,000. The court was skeptical of this testimony, as are we.

In the divorce, William received not only $410,500 in community property assets but also an additional $248,000 from a bank account as reimbursement for his separate property contribution to the purchase of the marital residence. Thus, William walked away from the divorce with approximately $658,500, while Tedde received about

15

$410,520. (Tedde received a separate payment of $20,000.) While it is conceivable that William's $658,500 in assets appreciated to $700,000 in less than two years, it is not believable that Tedde's $410,520 increased that much. Thus, William's argument — the court should have taken into account Tedde received $700,000 in assets in the divorce and could generate income from her "substantial assets" — is without merit. Moreover, the stipulated judgment reflects the parties' expectations Tedde would receive her share of the community property *and* permanent spousal support. Even if Tedde's community property assets were producing income, that did not constitute substantial evidence of a material change of circumstances justifying a reduction of William's spousal support obligation. (*In re Marriage of Norvall* (1987) 192 Cal.App.3d 1047, 1061.)

As to William's assets, the court concluded William had failed to show he lacked assets to pay spousal support. The court noted two telling omissions in William's evidence. First, William did not list his assets on his I&E's. Second, William "did not produce any evidence of the amount [he] received in the severance package [from his former employer] or how it was distributed." Other evidence, however, showed William had substantial assets available to him. William testified his portion of the assets from the divorce were now valued at $700,000. The stipulated judgment also indicated William had $880,000 in separate property he inherited form his parents. We reject William's claim the court failed to consider each party's obligations and assets as required by section 4320, subdivision (e).

2. *The Court Considered Section 4320, Subdivision (g)*

Pursuant to section 4320, subdivision (g), when ordering spousal support, the court must consider the supported party's ability to be gainfully employed "without unduly interfering with the interests of dependent children in the custody of the party." William asserts the court did not apply this factor. He asserts Tedde had the ability to be gainfully employed and was not encumbered by childcare concerns as the couple's children were in their 20's at the time of the hearing.

16

Contrary to William's assertion, the court did consider Tedde's ability to be gainfully employed. (§ 4320, subd. (g).) The court did not find childcare issues prevented her from being gainfully employed but found senior care issues did. Addressing this factor in its statement of decision, the court stated "it was anticipated in the Judgment that [Tedde] would relocate and assist her parents. Therefore, at the present, she requires support." The court's finding is supported by substantial evidence. The stipulated judgment included the parties' understanding that Tedde was assisting her elderly parents, who were in poor health, and that she was "not being paid for her assistance due to their lack of finances to pay for daily required assistance." The court properly gave consideration to the stipulated judgment when considering Tedde's ability to be gainfully employed. (See *In re Marriage of Dietz, supra*, 176 Cal.App.4th at p. 398 ["'the trial court's discretion to modify the spousal support order is constrained by the terms of the marital settlement agreement'"].)

3. *The Court Considered Section 4320, Subdivision (n)*

Section 4320, subdivision (n), provides that in ordering spousal support, the court shall consider any other factors it determines "are just and equitable." William asserts the court should have considered under this factor the financial benefit Tedde's parents derive from her acting as their unpaid caregiver four days a week. William fails to persuade us the court abused its discretion by failing to consider the finances of Tedde's parents in determining William's spousal support obligation.

E. *The Court Did Not Abuse Its Discretion in Determining the Amount of the Award*

William also challenges the amount of the spousal support award, asserting it exceeds Tedde's needs, keeps her at an inflated marital standard of living, and leaves him destitute. He also contends the court "gave no weight to any [section 4320] factors, except for [Tedde's] needs." We disagree.

17

A trial court enjoys broad discretion when balancing and determining the weight to give each section 4320 factor as it tries to accomplish substantial justice for the parties. (*In re Marriage of Schleich* (2017) 8 Cal.App.5th 267, 288.) Here, the trial court reduced William's spousal support obligation from $5,810 to $4,500 based on his changed circumstances. William insists, however, that his spousal support should have been reduced to zero. Because William was seeking the total elimination of his spousal support payment, he carried the burden of showing he was unable to pay any. (*In re Marriage of Dietz, supra*, 176 Cal.App.4th at p. 396.) The trial court correctly concluded William did not satisfy this burden. William was not forthcoming about a large portion of his assets, i.e., his separate property and severance package. Although William's job loss had resulted in a significant loss of income, this was not reflected in his spending. William's income and expense declarations filed after he sought modification of his spousal support obligation showed his monthly expenses were $10,000 to $13,000, excluding his spousal support payments to Tedde. William was able to pay these monthly expenses without incurring debt, evidence of substantial assets he could draw on to pay spousal support. Tedde's monthly expenses, according to her income and expense declaration, were $5,500, at least half of William's.

During their 25-year marriage, William had a lucrative career while Tedde stayed home and raised their children. As the trial court found, William has marketable skills and the ability to earn substantial sums. Tedde does not. While William is free to choose where he lives and what he does for a living, "he still has the legal responsibility to support" Tedde. We have reviewed the record and conclude the trial court did not abuse its discretion in balancing William's ability to pay with Tedde's needs, as the court tried to accomplish substantial justice for both of them.

18

III. *Retroactivity of the Spousal Support Modification*

Although the court found a substantial change of circumstances and reduced William's monthly spousal support payment from $5,810 to $4,500, the court denied his request to make the reduction retroactive to the date of filing. William contends the court's refusal to make the modification order retroactive was an abuse of the court's discretion. Section 4333 provides that an order modifying support "may be made retroactive to the date of filing the notice of motion or order to show cause, or to any subsequent date." We review the trial court's ruling on whether to make the modification order retroactive for an abuse of discretion (*In re Marriage of Left* (2012) 208 Cal.App.4th 1137, 1152), and we find none here.

William asserts the court did not give any reason for its refusal to make the order retroactive. He is wrong. In its statement of decision, the court stated it was denying William's retroactivity request because William had "not accomplished any meaningful attempts to obtain employment, [had] not reduced his costs of living as shown by his Income and Expense declarations and the funds are required for the support of [Tedde]." Considering the court's findings, we see no error.

VI. *Attorney Fees*

William contends the court erred by awarding Tedde attorney fees based on need (§§ 2030, 2032 et seq.) and denying him an attorney fee award as a form of sanctions (§ 271). We review both decisions for an abuse of discretion. (*In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 829 [award under § 2030 is reviewed for an abuse of discretion]; *In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1316 [decision on attorney fees under § 271 is reviewed for abuse of discretion].) Finding none, we reject both contentions.

A. *Need-Based Attorney Fees*

Section 2030 "'permits the trial court to order payment of attorney fees and costs as between the parties based upon their "ability to pay" and their "respective incomes and needs" in order to "ensure that each party has access to legal representation to preserve all of the party's rights."' [Citation.]" (*In re Marriage of Nakamoto & Hsu* (2022) 79 Cal.App.5th 457, 468-469.) "A court may award fees under section 2030 ""'where the making of the [fee] award, and the amount of the award, are just and reasonable under relative circumstances of the respective parties."' [Citation.]" (*Id.* at p. 469.)

Here, Tedde sought over $18,000 in need-based fees under section 2030. The court awarded her $7,500 in attorney fees to be paid in monthly installments. Explaining its ruling, the court indicated the award was "based upon the opportunity and ability of each party to pay" and "appropriateness." Other than stating his dissatisfaction with the court's order, William has not shown an abuse of the court's discretion. The evidence does not support William's contention that each party had an equal ability to pay. As discussed above, William had substantially greater assets. Thus, we discern no abuse of discretion of the court's discretion in awarding Tedde need-based attorney fees.

B. *Attorney Fees as Sanctions*

William asserted Tedde's conduct increased the costs of the litigation, and he requested the court order Tedde to contribute $5,000 toward his attorney fees and costs under section 271. The court denied the request, finding there was no egregious conduct and no substantial delay in the litigation of the modification request. Considering the evidence in the light most favorable to the trial court's order, we discern no abuse of the court's discretion. (*In re Marriage of Burgard* (1999) 72 Cal.App.4th 74, 82 [order under section 271 reviewed for an abuse of discretion].) The trial court could have reasonably found Tedde's conduct was not so obstructive, reprehensible, or caused unnecessarily delay such that sanctions were required under section 271.

DISPOSITION

The trial court's order is affirmed. Respondent is entitled to costs on appeal.


MARKS, J.*

WE CONCUR:


BEDSWORTH, ACTING P. J.


GOETHALS, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.